In re: **COLUMBIA LABORATORIES, INC. SECURITIES LITIGATION**

Nos. 00–2112–CIV, 00–2135–CIV, 00–2171–CIV, 00–2322–CIV, 00–2332–CIV, 00–2582–CIV.

United States District Court, S.D. Florida, Miami Division.

May 9, 2001.

Kenneth J. Vianale, Milberg Weiss Bershad Hynes & Lerach, LLP, Boca Raton, FL, for Plaintiffs.

Stanley H. Wakshlag, Akerman, Senterfitt & Eidson, PA, Miami, FL, Greg A. Danilow, Weil, Gotshal & Manges LLP, New York, NY, for Defendants.

### FINAL ORDER GRANTING MOTION TO DISMISS

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint filed December 22, 2000. Plaintiffs filed a Response in Opposition to Defendants' Motion to Dismiss on February 12, 2001. Defendants filed a Reply to Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss on March 14, 2001. The Court heard arguments on Defendants' Motion to Dismiss and Plaintiffs' Response thereto on April 26, 2001. Plaintiffs' Consolidated Amended Class Action Complaint ("Amended Complaint") asserts claims for violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder against all Defendants. In addition, Plaintiffs claim that the individual Defendants William J. Bologna, David L. Weinberg, and Norman M. Meier ("individual Defendants"), violated Section 20(a) of the Exchange Act.

### I. Factual Background

Plaintiffs commenced this securities class action on behalf of all individuals who purchased Defendant Columbia Laboratories, Inc.'s ("Columbia") common stock between November 8, 1999, and June 9, 2000. Plaintiffs allege that Columbia and the individual Defendants made misleading statements concerning Columbia's future prospects with respect to two drugs: Advantage–S and Crinone.

### Advantage–S

Since the early 1990s, Advantage–S had been sold as a contraceptive spermicide that prevented pregnancy by killing sperm before fertilization *in utero* can occur. (*See* Am. Compl. at ¶ 32.) The active ingredient in Advantage–S, nonoxynol–9 ("N–9"), is a microbicide that kills viruses and bacteria. (*See id.* at ¶¶ 32, 37 n. 2.) Preliminary studies conducted by the United Nations and the World Health Organization indicated that Advantage–S was safe to use for one to four times a day depending on dosage. (*See id.* at ¶¶ 2, 39, 40, 68, 76(c), 106.) However, excessive dosages of N–9 can lead to genital inflammation, irritation, lesions or ulcers. (*See id.*)

Defendants later promoted Advantage–S as a breakthrough drug that could prevent the spread of Human Immunodeficiency Virus ("HIV") in women. (*See id.* ¶ 3.) In May 1996, the United Nations Global Program on HIV/AIDS selected Advantage–S for Phase III clinical study (the "UNAIDS study") to test the efficiency of Advantage–S in preventing the heterosexual transmission of HIV. The UNAIDS study was to be the final step before Columbia sought FDA approval. (*See id.* at ¶ 37.) The UNAIDS study involved approximately 2000 female prostitutes randomly chosen from volunteers in Africa, with half receiving Advantage–S and the other half receiving a placebo drug. (*See id.* at ¶ 66.) The objective of the UNAIDS study was to determine whether a significant statistical difference would occur in the incident of HIV infection between women who received a placebo and women who used Advantage–S. (*See id.*)

The UNAIDS study was conducted as a double-blind study where neither the female subjects nor the study administrators knew which group was taking Advantage–S. (*See id.* at ¶ 67.) The UNAIDS study protocol described a dose of Advantage–S as containing 52.5 milligrams of N–9 and placed no upper limit on the number of applications in one day. (*See id.* at ¶¶ 106, 109, 110(c).) On June 12, 2000, Defendants announced that the results of the UNAIDS study indicated that Advantage–S failed to prevent the transmission of the HIV virus. (*See id.* at ¶ 98.) Instead, excessive usage or dosage of N–9 led to lesions that actually increased the chance of HIV transmission. (*See id.* at ¶ 40.) Defendants admitted that Advantage–S failed the UNAIDS study because the protocol placed no upper limit on dosing. (*See id.* at ¶¶ 106–07.) As a result, subjects used the product after each act of intercourse, which ranged up to twenty times per day. (*See id.*)

## Disputed Statements

Plaintiffs allege that Defendants misled investors by making numerous false and misleading statements (the "disputed statements") which led them to believe that Advantage–S would be proven clinically effective in inhibiting the spread of AIDS. Those disputed statements include:

(1) statements made in Columbia's 1999 Annual Report ("1999 Annual Report") that the company was optimistic that the results of the Phase III study would indicate that Advantage–S effectively reduces transmission of the HIV virus [1];

(2) statements made in a March 20, 2000 press release ("March 20, 2000 Press Release") in which Defendants touted both the market potential as well as the efficacy of the product [2];

(3) statements made during a March 20, 2000 conference call ("March 20, 2000 Conference Call") in which Defendants emphasized that all data from the study would be in and analyzed over the next three months in which Defendants talked about the Phase III trial in a way that made analysts believe it was a "done deal"; (*See id.* at ¶ 77.)

(4) statements made by Defendant Bologna in an April 3, 2000 interview pub-

---

1. Columbia's 1999 Annual Report included a Letter to Shareholders stating:

   The Company is optimistic that the results of the Phase III study will find that Advantage–S offers a statistically significant reduction in the transmission of the HIV-virus and other sexually transmitted organisms, thus providing a powerful tool in the fight against the spread of AIDS. The impact of these results on Advantage–S is immense, with the world-wide market for such products exceeding $1 billion. We are very excited about the impact this study will have on Columbia's future. (*See* Am. Compl. ¶ 66.)

2. The March 20, 2000 Press Release stated:
   We believe that Advantage–S widens the range of safe sex choices available to sexually active people and most importantly,

   empowers women in the fight against AIDS. The development of polycarbophil based bioadhesive vaginal gel permits the reduction of the dose of nonoxynol–9, thereby increasing the safety margin and simultaneously increasing the efficiency of virucidal actvity.

   .     .     .     .     .

   UNAIDS will complete the multi-center, randomized placebo controlled double blind study of woman at high risk of HIV infection within 90 days. The Company is optimistic that this study conducted in Africa and Asia will demonstrate that results in a statistically significant reduction in the transmission of the HIV virus and other sexually transmitted diseases such as Chlamydia. (*See id.* ¶¶ 73, 75.)

lished in *The Wall Street Transcript* (April 3, 2000 Interview) in which he characterized the next three or four years as an investment period[3]; and

(5) statements made in a May 9, 2000 press release (May 9, 2000 Press Release) in which Defendants stated that they believe the company will receive approval in six months of submission and that Advantage–S through its key ingredient Nonoxynol–9 will enable a safe and non-irritating decrease in the risk of infections with STD's including HIV[4].

Plaintiffs further allege that Defendants knew but failed to disclose Columbia's allege failure to provide proper organizational safeguards, failed to design clinical trials limiting the dosage of Advantage–S, and failed to design a Phase III trial that was not fundamentally flawed from its inception. Plaintiffs assert that as a result of these statements, Columbia's stock prices rose to artificially inflated prices which the individual Defendants allegedly took advantage of by selling their shares at an inflated value.

*Crinone*

Crinone is a fertility drug produced by Defendants that is used by women who experienced difficulty conceiving children. (*See id.* at ¶¶ 1, 35, 50.) It contains the human hormone progesterone and was approved for sale by the FDA in 1997. (*See id.* at ¶¶ 1, 35, 50.) Plaintiffs allege that after marketing rights were transferred to a major pharmaceutical company, Ares–Serono, Defendants misstated the prospects for future sales with regards to the marketing and profitability of Crinone. Plaintiffs point to a November 8, 1999 press release ("November 8, 1999 Press Release") in which Defendants stated that as a result of a new marketing agreement for Crinone, Columbia would experience an increase in profits.[5] (*See id.* at ¶¶ 60, 71.)

---

**3.** The April 3, 2000 Interview published in *The Wall Street Transcript* reads:

> As we've announced to the world, and most people know, with our technology, one of the things that we've dong is develop a product to prevent the transmission of the HIV virus, of the AIDS virus in women. We've been running studies for the last six years, and we will complete by mid-year our Phase III studies. We believe we will have the only product that a woman can use to prevent the transmission of HIV. (*See id.* ¶ 65.)

**4.** Plaintiffs emphasize in their Amended Complaint statements from the May 9, 2000 press release which states:

> Under current FDA resolutions, the Company believes it will receive a priority review which should lead to approval within six months of submission. Columbia is also working to ensure that Advantage–S is made available, as soon as possible, to women in Africa and Asia in order to help stem the tide of the AIDS epidemic and prevent the transmission of HIV to women, their offspring, and partners.

> . . . . .

> The bioadhesive polymer maintains greater contact between the anti-STD agent and the infectant for a much greater period of time, enabling a lower concentration to act longer on the infectant ... Such delivery will enable a safe and non-irritating decrease in the risk of infections with STD's including HIV. (*See id.* ¶¶ 86, 88.)

**5.** The November 8, 1999 press release states in relevant part:

> As previously announced, Ares–Serono, the world leader in reproductive health acquired the license and distribution rights to Crinone from American Home Products on July, 1999. Ares–Serono disclosed on November 2, 1999, that it paid $68 million of these rights. Under the terms of the agreement, Ares–Seronon assumed the same financial obligations to Columbia. New data on the efficacy of Crinone was presented at the American Society for Reproductive

Plaintiffs also cite the November 12, 1999 quarterly report on Form 10–Q in which Defendants attributed Columbia's increased profitability to sales of Crinone. (*See id.*) Plaintiffs allege that Defendants knew but failed to disclose that (1) the transfer of the Crinone license to Ares–Serono was taking significantly longer than previously announced, and Ares–Serono did not even have a finalized license to market Crinone; (2) due to inventory backlogs, Defendants would not recognize fiscal profitability from Crinone sales until the second half of fiscal year 2000; and (3) because Ares–Serono did not even market Crinone until early June of 2000, there was no basis for hyping its anticipated profitability.

## II. Legal Standard

Dismissal is justified only when " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 810, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (quoting *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980)). For the purpose of the motion to dismiss, the complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law. *See Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir.1993).

Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA") specifically to curb "abusive securities litigation," *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999), by "permit[ing] the dismissal of frivolous cases at the earliest feasible stage of the litigation, thereby reducing the cost to the company and by derivation, to its shareholders, in defending a baseless action." *See id.* The PSLRA authorizes a court upon a motion to dismiss to examine the disclosures being attacked within the context of the entire document from which the statement was made. *See* 15 U.S.C. § 78u–5(e); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999).

## III. Analysis

The dispositive issue of law before this Court is whether the disputed statements are insulated from liability under the statutory safe-harbor protection of the PSLRA for forward-looking statements. Congress created the PSLRA safe-harbor protection "in order to loosen the 'muzzling effect' of potential liability for forward-looking statements, which often kept investors in the dark about what management foresaw for the company." *Harris*, 182 F.3d at 806 (11th Cir.1999). This safe-harbor even protects forward-looking statements which turn out to be untrue from liability under Section 10(b). *See id.* In order to pass muster, even at this preliminary pleading stage, the Amended Complaint must survive rigorous scrutiny under the heightened pleading standards established by the PSLRA. Under the PSLRA, the safe-harbor protection for forward looking statements applies (1) if meaningful cautionary language accompanies the forward-looking statements or (2) if the plaintiff fails to plead with particu-

---

Medicine in September as Ares–Seronon prepared to launch the product. Ares–Serono is currently selling Cirnone in eight countries and anticipates selling Crinone in twenty countries by the end of the next year. (*See id.* at ¶ 57.)

larity facts giving rise to a strong inference that the defendant had actual knowledge of the falsity of their statements when made. *See* 15 U.S.C. § 78u–5(c)(1)(B)(ii)(II); *Harris,* 182 F.3d at 803.

Forward-looking statements include: (1) a statement containing a projection of revenues; (2) a statement of the plans and objections of management for future operations, including plans or objectives relating to the products or services of the issuer; (3) a statement of future economic performance; and (4) any statement of the assumptions underlying or relating to the aforementioned statements. *See* 15 U.S.C. § 78u–5(i)(1); *Harris,* 182 F.3d at 804. In determining whether a statement is forward-looking, the Court must read the statements not in isolation but in the context of the entire document. *See Harris,* 182 F.3d at 805. Even statements that include both forward-looking and non-forward-looking factors must be treated as forward-looking. *See id.* at 806 ("[W]ere we to banish from the safe harbor lists that contain both factual and forward-looking factors, we would inhibit corporate officers from fully explaining their outlooks .... That would hamper the communication that Congress sought to foster.").

█ The Court finds that the disputed statements made by Defendants with respect to Advantage–S constitute forward-looking statements. All of the disputed statements reflect Defendants' optimism and expectations about a future event— namely, the completion of the UNAIDS study—and its future plans for its product based on that assumption. Defendants state that they are "optimistic" Advantage–S would pass the UNAIDS study (1999 Annual Report; March 20, 2000 Press Release), that they "believed" Advantage–S would be the only product available to women to prevent the transmission of HIV (April 3, 2000 Interview), and that they "believed" Columbia would receive FDA approval within six months (May 9, 2000 Press Release). Defendants further projected that successful completion of the study would lead to FDA "approval in six months of submission" (May 9, 2000 Press Release), a "world-wide market for such products exceeding $1 billion" (1999 Annual Report), and a three or four year investment period (April 3, 2000 Interview). The soundness of these expectations or the motivation for them is irrelevant to the analysis. These statements are all linked to the same future event and refer to it accordingly—the possible successful completion of the UNAIDS study. Thus, the statements made by Defendants regarding Advantage–S touting its possible effectiveness and promoting its marketability clearly constitute forward-looking statements under the PSLRA in that they are "assumptions underlying or relating to" the "plans and objectives of management ... relating to" Advantage–S. 15 U.S.C. § 78u–5(i)(1)(B),(D).

█ Similarly, the statements made by Defendants regarding Crinone qualify as forward-looking statements. Defendants touted the projected increased profits as a potential result of a new marketing agreement for Crinone with Ares–Serono. Like with Advantage–S, Defendants were merely expressing optimism consistent with the PSLRA over the future profitability of their product with respect to the licensing agreement with Ares–Serono. *See* 15 U.S.C. § 78u–5(i)(1).

The safe-harbor provision of the PSLRA insulates forward looking statements that are accompanied by "meaningful cautionary language". Such meaningful cautionary statements must be more than mere

boilerplate language. *See Harris,* 182 F.3d at 807. To be "meaningful" the statements must identify important factors that could cause results to differ materially from those in the "forward-looking statement." *See Harris,* 182 F.3d at 803. The Eleventh Circuit has taken an even more liberal approach in holding that cautionary language need not explicitly refer to particular risk which ultimately came to pass but merely warn investors of risks similar to that actually realized to give sufficient notice of the investment's potential danger. *See id.*

■ The Court finds that the language accompanying these forward-looking statements qualify as meaningful cautionary language. The disputed statements were consistently accompanied by language indicating that the product and projected results depended on the successful completion of UNAIDS study. Statements such as "[f]actors that could cause actual results to differ from expectations include, without limitation ... the timely completion of studies and approvals by FDA and other regulatory agencies" and "[s]uch risks and uncertainties include, among other things, the successful timely completion of the study now being concluded by the UNAIDS group" explicitly included the exact risk factor that led to the Plaintiffs' ultimate disappointment—failure to successfully complete ongoing tests for Advantage–S. (*See* Defs' Mot. Dismiss 17, 22.) Plaintiffs, as a result, were put on notice of the particular risks of their investment. Similarly, the language accompanying the Crinone statements constitute meaningful cautionary statements. Defendants specifically stated that the future results of their license agreement with Aero–Serono depended, in part, on "the ability of the [Columbia]'s Crinone liscen-

see [Ares–Serono] to successfully market the product". (*See* Defs.' Mot. Dismiss, Exh. J.) Thus, the Court finds Defendants' statements with respect to Advantages–S and Crinone were accompanied by meaningful cautionary language.

■ Assuming *arguendo* that these forward-looking statements were not accompanied by meaningful cautionary language, the statements would still be shielded from liability if Plaintiffs failed to plead with particularity facts giving rise to a strong inference that Defendants had "actual knowledge" of the falsity of their statements when made. *See* 15 U.S.C. § 78u–4(b)(2). Plaintiffs' argument relies on a series of conclusory allegations stacked upon one another without any sufficient supporting facts to show "actual knowledge". They assert that Defendants must have known that Advantage–S would fail the UNAIDS study because the protocol did not establish an upper limit on the number of times each day that the subjects in the study could apply Advantage–S. Plaintiffs submit that Defendants must have known the number of times the subjects would have used Advantage–S, the kind of damage N–9 would do to the subjects bodies, and the inevitable failure of Advantage–S in the UNAIDS study. However, Plaintiffs have not pled any particularized facts which give a strong inference that Defendants had actual knowledge that the disputed statements were false.

There is also significant doubt as to whether Plaintiffs are alleging that the disputed statements were necessarily false. Plaintiffs' counsel stated in oral arguments that "[Plaintiffs] are not saying that they knew the study would fail." (Tr. Hr'g of Mot. to Dismiss, at 37.) Instead, Plaintiffs' counsel recognized that "[p]erhaps

[Defendants] thought that there was a slim chance, at best, that the study would succeed." (*Id.*) Plaintiffs appear to concede that they are not alleging that Defendant's intentionally made false statements but instead that given the slim chances of passing the UNAIDS study, Defendants should not have promoted Advantage–S so ardently. Such a concession inherently undermines any allegations made by Plaintiffs that Defendants actually knew of the falsity of their statements.

Plaintiffs argue in rebuttal that Defendants' statements do not fall within the PSLRA's safe-harbor provision for forward-looking statements. Plaintiffs contend that the safe-harbor provision does not protect the statements that omit existing facts or circumstances. In support of this proposition, Plaintiffs rely on *In re: Cell Pathways, Inc. Sec. Litig.*, 2000 WL 805221 (E.D.Pa.). On its face, *Cell Pathways* appears analogous to the above-styled case. The *Cell Pathways* defendants made statements regarding the efficacy and future profitability of a new compound, Exisulind, in the treatment of colonic polyps and the prevention of colon cancer. However, Exisulind failed Phase III of its FDA study. The reason for the failure appeared to be a fundamental error in the design of the study. In particular, subjects for the study had been selected in a flawed manner. The defendants argued that the PSLRA safe-harbor provisions insulated them from liability. The district court rejected that argument by stating that "allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe-harbor of the Securities Act." *Id.* at 11. The district court for the Eastern District of Pennsylvania offers no further elaboration for this significant judicially created exception. Furthermore, it gives no additional explanation as to what particular omissions of existing facts or circumstances it was referring. A careful dissection of *Cell Pathways* decision, however, indicates that the district court found persuasive the fact that after the defendants learned in January of 1999 that Exisulind failed to show significant positive results in the Phase III study and that their were fundamental flaws in the design of the study, the defendants continued to make encouraging statements to the public. The district court stated that "[t]he *crux* of Plaintiffs' claim is that the positive statements of [the defendants] ... were misleading in that [the defendants] continued to publish positive information concerning the status and development of [E]xisulind while [the defendants] knew of the flaws in the Phase III study." *Id.* at 4 (emphasis added).

Therein lies the critical distinction between *Cell Pathways* and the facts of the above-styled case. All of the disputed statements in the case at hand were made before Defendants announced the Advantage–S' failure of Phase III of the UNAIDS study. In light of the fact that the study was double-blind, the administrators of the study, the subjects in the study, and Defendants could not have been aware of the eventual results of the UNAIDS study before it had been completed. Plaintiffs do not allege that Defendants were aware of the results of the studies before these statements were made. Instead, as Plaintiffs indicated at oral argument, they are not asserting that Defendants knew that the study would fail but should have known that there was a strong likelihood that it would fail. (*See* Tr. Hr'g of Mot. to Dismiss, at 37.) In *Cell Pathways*, the defendants had already been informed of the results of the Phase

III study and had admitted that there was a fundamental flaw in the study's design before making the alleged misleading statements. In the case at hand, no individuals including the study administrators had any indication of the eventual results of the study. Furthermore, *Cell Pathways* is somewhat at odds with case law from the Eleventh Circuit which has held that a material and misleading omission can fall within the forward-looking safe-harbor. See *Ehlert v. Singer*, 245 F.3d 1313 (11th Cir.2001) at 9. Thus, the Court rejects Plaintiffs' argument that the PSLRA safe-harbor provision does not insulate the disputed statements because of omissions of existing facts or circumstances.

It is unnecessary for this Court to consider whether Plaintiffs sufficiently alleged actual knowledge of this falsity or whether there is derivative liability claim under Section 20(a). This Court has already found the disputed statements to be forward-looking statements accompanied by meaningful cautionary language. In addition, there can be no derivative liability against a controlling person under Section 20(a) because Plaintiffs' underlying claims fail. See *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 396–97 (11th Cir.1996)(Section 20(a) does not give rise to a cause of action distinct from any underlying violation of the securities laws); *In re Rexall Sundown, Inc.Sec.Litig.*, No. 98–8798–CIV–DIMITROULEAS, slip op. at 9 (S.D.Fla. Mar. 29, 2000).

## IV. Conclusion

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Defendants' Motion to Dismiss be, and the same is hereby, GRANTED. The complaints including the Consolidated Amended Class Action Complaint are hereby DISMISSED WITH PREJUDICE. The Court shall retain jurisdiction to award attorneys' fees and costs if any on an appropriate motion.

DONE and ORDERED in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 9th day of May, 2001.