In re UNICAPITAL CORPORATION
SECURITIES LITIGATION.

Nos. 00–2129–CIV., 00–2268–CIV., 00–
2367–CIV., 00–2412–CIV., 00–2454–
CIV., 00–2556–CIV., 00–2560–CIV.

United States District Court,
S.D. Florida.

June 29, 2001.

Kenneth Vianale, Maya Saxena, Milberg, Weiss, Bershad, & Lerach, LLP, Boca Raton, FL, for the Plaintiff.

Keith Olin, Morgan, Lewis & Bockius, LLP, Miami, FL, for Defendant Unicapital Corporation.

Lewis Murphy, Steel, Hector & Davis, Miami, FL, for Defendant Jonathan New.

Tracy Nicholas, Holland & Knight, LLP, Miami, FL, Evan Chesler; Keith Hummel, Cravath, Swaine & Moore, New York City, for Underwriter Defendants.

Thomas Cimino, Vedder, Preic, Kaufman & Kammholz, Chicago, IL, for Defendant Robert New.

Richard Jackson, Stearns, Weaver, et. al., Miami, FL, for Defendant Stuart Cauff.

## ORDER & MEMORANDUM OPINION ON MOTIONS TO DISMISS

HIGHSMITH, District Judge.

THIS CAUSE is before the Court upon the separate motions to dismiss filed by (1) Robert New;[1] (2) Jonathan New; (3) Stuart Cauff (collectively the "Individual Defendants"); and (4) Morgan Stanley Dean Witter & Co., Salomon Smith Barney, Inc., and Friedman, Billings, Ramsey Group, Inc. (collectively the "Underwriters"). The motions have been fully briefed, and they are ripe for adjudication.

## I. BACKGROUND

■ This is a putative class action lawsuit, which arises from Unicapital Corporation's ("Unicapital") brief existence as a publicly-traded company. Counts I and II of the amended class action complaint assert claims under §§ 11 and 12(a)(2) of the Securities Act of 1933 (the "Securities Act"), respectively. Count IV of the amended class action complaint asserts a claim pursuant to § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and the Security and Exchange Commission's (the "SEC") Rule 10b–5. Additionally, Counts III and V of the amended class action complaint assert claims for controlling person liability against the Individual Defendants under § 15 of the Securities Act and § 20(a) of the Exchange Act, respectively. In order to assess the viability of these claims, it is necessary to set forth in some detail the formation, structure, and operation of Unicapital as a publicly-traded company.[2]

### A. The Rise of Unicapital

"Unicapital was founded in 1997 to create a national consolidator and operator of equipment leasing and specialty finance business serving the commercial market." Prospectus at 4. Unicapital's founders, Jonathan J. Ledecky and Robert New, did not break into the equipment leasing and financing business in a gradual manner. Rather, within a year of its formation, Unicapital went public and purchased a number of existing equipment leasing companies and related businesses (the "targeted companies") and consolidated them. *See id.* at 6–8 (listing the companies to be acquired). The purchase of the targeted companies was financed primarily by an initial public offering of 28 million shares of common stock on May 14, 1998 (the "1998 public offering"), which raised approximately $532 million in capital. In financial parlance, Unicapital undertook what is known as a "roll-up,"—the acquisition and consolidation of a number of com-

---

1. On March 29, 2001, Robert New was killed in an airplane crash near Aspen, Colorado. Pursuant to Rule 25 of the Federal Rules of Civil Procedure, the personal representative of his estate, Monica New, was substituted as a party on June 8, 2001. For purposes of continuity, this order refers to Robert New, rather then Monica New.

2. Unless otherwise noted, the factual information concerning the formation and structure

of Unicapital that follows is derived from (1) the amended class action complaint and (2) publicly filed documents submitted in conjunction with the motions to dismiss. In securities litigation, it is appropriate to take judicial notice of publicly filed documents at the motion to dismiss stage. *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1275–81 (11th Cir.1999).

panies in a field of business, which is often financed by an initial public offering.[3]

### 1. The Assets Acquired Through the Roll-up

In conjunction with the 1998 public offering, Unicapital, in accordance with the Securities Act, filed its registration statement and prospectus with the SEC.[4] Those documents contained pro forma financial statements for Unicapital, which combined the assets and liabilities of the targeted companies.[5] *See* Prospectus at F–4 to F–15. As shown in the pro forma balance sheets, the acquisition of the targeted companies yielded total assets of $674,649,000.00. *See id.* at F–6. An adjustment was made to this figure, chiefly by the addition of $470,215,000.00 worth of goodwill, resulting in adjusted total assets of $1,174,400,000.00. *Id.*

The prospectus explained the $470,215,000.00 figure as follows:

Approximately $470.2 million, or 40%, of [Unicapital's] pro forma total assets as of March 31, 1998, after giving effect to [the 1998 public offering], consists of goodwill arising from the acquisitions of the [targeted companies]. Goodwill is an intangible asset that represents the difference between the aggregate purchase price for the net assets acquired

and the amount of such price allocated to such assets for purposes of [Unicapital's] pro forma balance sheets.

*Id.* at 17. In terms of the $559.5 million, which Unicapital paid to purchase the targeted companies, the prospectus accounted for the goodwill figure as follows:

$21.8 million of the purchase price [was] allocated to aircraft under operating leases and $33.2 million to a deferred tax liability to be established upon the conversion from S Corporation or partnership status of certain of the [targeted companies] and *the remaining purchase price in excess of book value of assets acquired [was] allocated to goodwill.*

*Id.* at F–12 (emphasis supplied). In other words, $470,215,000.00, or 84%, of the $559.5 million price that Unicapital paid to acquire the targeted companies, and establish its operations, was attributed to goodwill. Unicapital's pro forma financial statements also provided that the goodwill was to be amortized "over a 15 to 40 year period." *Id.* at 31 n. 3.

### 2. Unicapital's Operational Structure and the Big Ticket Division

Unicapital's stated goal was "to become a leading consolidator and operator of equipment leasing and specialty finance businesses." *Id.* at 5.[6] Upon completion

---

**3.** *See Emtec, Inc. v. Condor Tech. Solutions, Inc.*, No. CIV. A. 97–6652, 1998 WL 834097, at *1 ("A roll-up is a process whereby one corporate structure acquires other companies, generally within a similar field of business, while at the same time stock in the acquiring corporation is offered to the public through an initial public offering ('IPO').")

**4.** *See* 15 U.S.C. §§ 77f–g, 77j. Unicapital's prospectus was incorporated, in its entirety, into the registration statement. For purposes of convenience, this order cites only to page numbers of the prospectus.

**5.** Pro forma financial statements are "one[s] prepared on the basis of assumptions as to future events." *Herman & MacLean v. Hud-*

*dleston*, 459 U.S. 375, 378 n. 1, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). In the case of Unicapital's pro forma financial statements, the future events were the acquisitions of the targeted companies. All twelve of the targeted companies were successfully acquired contemporaneously with the 1998 public offering.

**6.** In their memorandum of law, the Underwriters explain Unicapital's business plan in plainer English: "Unicapital was formed to offer 'one-stop' shopping for companies seeking to lease manufacturing equipment, computers, aircraft, and other expensive equipment." Underwriters Mem. of Law at 1; *see also* Gregg Fields, *Unicapital Execs out Amid Losses, Stock Drop*, Miami Herald, July 26, 2000, at 1C, 10C ("Unicapital's core business

of the roll-up of the targeted companies, Unicapital had acquired and consolidated twelve entities from the leasing and specialty finance industry. Unicapital organized those entities into five departments: (1) the computer and telecommunications equipment leasing department, which included lease financing for computers, workstations, servers, telephone systems, switches, networks, peripherals, and related high-technology equipment; (2) the large ticket leasing and structured finance department, which covered leases for equipment with a purchase price in excess of $5,000,000.00, such as aircraft, satellites, rail and other transportation equipment; (3) the middle market leasing department, which generally included leases for equipment with a purchase price of between $250,000.00 and $5,000,000.00, such as construction and manufacturing equipment; (4) the small ticket leasing department, which covered leases for equipment with a purchase price of less than $250,000.00; and (5) the lease servicing department, which was responsible for lease administration and processing services. *See id.* at 6–8. These departments were further divided into practice groups. *See generally* Amend. Compl. at 13–14.

Of particular import to the instant case is the large ticket leasing and structured finance department, which the parties refer to in the moving papers as the Big Ticket Division.[7] Initially, three of the targeted companies, Cauff, Lippman Aviation, Inc. ("Cauff Lippman"), Municipal Capital Markets Group, Inc. ("MCMG"), and the NSJ Group ("NSJ"), were integrated into the Big Ticket Division. *See* Prospectus at 6–7. MCMG, a financing company, was purchased by Unicapital for $14 million, with one-half of the purchase price being cash and one-half Unicapital

common stock. Both Cauff Lippman and NSJ provided lease financing for used commercial jet aircraft and jet aircraft engines. Cauff Lippman was purchased for $80 million ($48 million in cash and $32 million in Unicapital common stock). Additionally, Stuart Cauff, the president of Cauff Lippman, became the chief executive officer of the Big Ticket Division. *See id.* at 103. NSJ was purchased for $26.7 million ($16 million in cash and $10.7 million in Unicapital common stock). Through the purchases of Cauff Lippman and NSJ, Unicapital acquired a fleet of aircraft "includ[ing] B727s, B737–200s, [and] DC–9s, many of which had Pratt & Whitney JT8D engines." Amend. Compl. at ¶ 81. That fleet formed the bulk of the leasing inventory for the Big Ticket Division.

Early on, the Big Ticket Division (specifically, its aircraft leasing group, designated as the "Air Group") appeared profitable. In 1998, that sector "purportedly contributed the lion's share of revenue and profitability to [Unicapital]—$348.5 of $511 million, or nearly 70%, in revenues and $41.5 million of $57 million in profits." *Id.* at ¶ 38. The Big Ticket Division rapidly expanded its original fleet of aircraft. By July of 1998, Unicapital had spent an additional $143 million to purchase more airplanes for the Big Ticket Division's fleet. *See id.* at ¶ 86. Eventually, Unicapital "expend[ed] over $1 billion to acquire 45 commercial jet aircraft to increase [its Big Ticket Division's] Air Group's portfolio to 70 commercial aircraft." *Id.* "[B]y all measurements, the [1998 public offering] was a tremendous success, raising over half a billion dollars, and the [c]ompany seemed poised for increasing growth and profitability—especially in its most profitable aircraft leasing division." *Id.* at ¶ 40.

---

is equipment leasing: It buys equipment— ranging from computers to jet engines—and then leases it to companies.").

**7.** The Court will hereinafter also utilize the term Big Ticket Division.

## B. The Fall of Unicapital

Unicapital's success, and in particular that of the Big Ticket Division, was short-lived. After enjoying immediate success in 1998, its first year of operation, Unicapital experienced an extremely volatile year in 1999. At that time, its stock price dipped as low as $1.875 per share from the opening price of $19.00 per share during the 1998 public offering. *See* Amend. Compl. at ¶¶ 120–143 (chronicling Unicapital's 1999 fiscal year). At the outset of 2000, Unicapital's prospects again looked strong, and its stock price rebounded somewhat, after Unicapital reported favorable 1999 fourth quarter earnings. *See id.* at ¶¶ 141–143. The optimism attributable to those numbers, however, did not last long.

On May 15, 2000, Unicapital for the first time revealed that the Big Ticket Division recorded no new lease originations during the fourth quarter of 1999. *See id.* at ¶ 149. Moreover, Unicapital announced that it was ceasing the operations of the Big Ticket Division and that:

> it had incurred a pre-tax loss of $298.3 million in the first quarter [of 2000], that included the following special charges: (a) a write-off of $239.1 million of impaired goodwill, principally due to the [c]ompany's decision to exit the Big Ticket Division; (b) a $33.5 million write-down of the book value of aircraft engine inventory due to the decline in the current market value of certain engine assets; (c) a special charge of $11.7 million incurred by Unicapital from its exposure to Tower Air, which declared bankruptcy; (d) a $4.0 million write-

down of the book value of the [c]ompany's aircraft portfolio due to adverse market conditions; and (e) restructuring costs of $1.9 million associated with the closing of non-core businesses and staff reductions.

*Id.* at ¶ 166. This news caused Unicapital's stock price to plummet. The stock price quickly fell below $1 per share, and, by July 26, 2000, the stock was trading at less than $00.44 per share.[8] Unicapital never recovered. And, on December 11, 2000, it filed for bankruptcy protection.[9]

## II. DISCUSSION

This putative shareholder class action followed in the wake of Unicapital's precipitous decline.[10] The gravamen of the amended class action complaint is that the value of the assets acquired by Unicapital through the buyout of the targeted companies, in particular the value placed upon goodwill, was materially misrepresented. Plaintiffs especially take issue with the valuation of the fleet of aircraft that Unicapital acquired from Cauff Lippman and NSJ. In that regard, Plaintiffs maintain that Unicapital's registration statement and prospectus failed to disclose that a significant number of the acquired planes would become obsolete as of December 31, 1999, by operation of the Airport Noise and Capacity Act of 1990 (the "ANCA"), 49 U.S.C. § 47510 et seq. Moreover, Plaintiffs contend that Unicapital continued to misrepresent the value of its fleet in public filings and statements, until it announced that its was disbanding the Big Ticket Division on May 15, 2000. The amended

---

8. *See* Gregg Fields, *Unicapital Execs out Amid Losses, Stock Drop*, Miami Herald, July 26, 2000, at 1C (charting decline in Unicapital's stock price).

9. *See* Docket Entry No. 34 (Notice of Bankruptcy). The filing for bankruptcy has stayed this action with respect to Unicapital. *See* 11 U.S.C. § 362.

10. Eight separate actions were filed in the United States District Court for Southern District of Florida. In accordance with Local Rule 3.9(C), which provides for the consolidation of similar actions before a single judge, all of the cases were transferred to the undersigned's docket. The cases were then consolidated into a single proceeding.

class action complaint names as defendants: (1) Robert New, Unicapital's former chief executive officer; (2) Jonathan New, Unicapital's former chief financial officer; (3) Stuart Cauff, the former chief executive officer of Unicapital's Big Ticket Division and a former director of Unicapital; and, (4) the Underwriters, the investment banks that underwrote Unicapital's 1998 initial public offering.[11]

At this point, a brief overview of the ANCA is necessary. In 1969, the Federal Aviation Agency (the "FAA") established regulations setting noise limits for aircraft. *See generally* Vicky Tsilas, Note, *An Analysis of the Phase-out Provisions of the Airport Noise and Capacity Act of 1990* (hereinafter *"Phase-out Provisions"*), 4 Fordham Envtl. L.R. 83, 84–87 (1992) (discussing the development of FAA's noise regulations). Under this regulatory regime, "[a]ircraft are categorized by the noise level ranging from stage 1, the noisiest, to stage 3, the quietest."[12] *Fine Airlines, Inc. v. F.A.A.*, 51 F.3d 1033, 1034 (11th Cir.1995) (per curiam). In 1990, Congress enacted the ANCA, "which is designed to provide a long-term solution to the nations (sic) aircraft noise pollution problem." *Phase-out Provisions*, 4 Fordham Envtl. L.R. at 84.

The ANCA's provisions were designed to establish a national aviation noise policy. In establishing this national policy, the statute concentrates on two separate and distinct goals. *The first goal is the national phasing out of stage two aircraft and the eventual creation of an all stage three fleet.* The second goal, is the implementation of a national noise

policy to review proposed airport noise and access restrictions on the operations of stage two and stage three aircraft. *Id.* at 89–90 (emphasis supplied) (footnotes omitted). The ANCA set the deadline for phasing out stage 2 aircraft for December 31, 1999, *see* 49 U.S.C. § 47528(a), and assigned to the Secretary of Transportation the responsibility for developing a phase-out schedule. *See* 49 U.S.C. § 47528(c). "Air carriers could comply with the noise requirements by purchasing stage 3 aircraft or, through hushkits, adapting their stage 1 or 2 aircraft to stage 3 noise levels." *Fine Airlines, Inc.*, 51 F.3d at 1034.[13] In short, the ANCA mandated that, as of "December 31, 1999, all aircraft that operate to or from an airport in the United States must comply with stage three noise levels, as determined by the Secretary of Transportation." *Phase-out Provisions*, 4 Fordham Envtl. L.R. at 90.

In the amended class action complaint, Plaintiffs aver that the fleet of aircraft acquired by Unicapital in May of 1998, which formed the majority of the Big Ticket Division's inventory, was made up largely of stage 2 aircraft that could not operate in the United States after December 31, 1999, unless they were retrofitted with "hushkits" to make them stage 3 compliant. *See* Amend. Compl. at ¶¶ 81–85. According to Plaintiffs, the cost of equipping the fleet with "hushkits" or replacing the stage 2 aircraft by December 31, 1999 was prohibitive. *See id.* at ¶¶ 84–86. Thus, Plaintiffs argue, Unicapital was destined to abandon the Big Ticket Division in 2000, as

---

**11.** Unicapital is also named as a defendant. As noted earlier, this action is currently stayed with respect to Unicapital by operation of the Bankruptcy Code's automatic stay provision. *See supra* Note 9.

**12.** Stage 1 aircraft were effectively phased out of use in the United States prior to enactment

of the ANCA. *See Phase-out Provisions*, 4 Fordham Envtl. L.R. at 86–89.

**13.** A "hushkit" essentially is a muffler for an airplane engine. *See In re Viscount Air Sers., Inc.*, 232 B.R. 416, 431 (Bankr.D.Ariz.1998).

the fleet it acquired in May of 1998 "only had a useful economic life of at maximum, until December 31, 1999." *Id.* at ¶ 87. Defendants have moved to dismiss the case. They argue that the factual allegations in the amended class action complaint are insufficient to state claims under either the Securities Act or the Exchange Act. The Court will address the claims under the two acts separately.[14]

### A. The Securities Act Claims

■ In Counts I and II of the amended class action complaint, Plaintiffs have asserted claims under §§ 11 and 12(a)(2) of the Securities Act, respectively. The Eleventh Circuit has succinctly set forth the elements for claims under these two provisions, as follows:

> Section 11 of the Securities Act creates a private cause of action where a registration statement either contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. A § 11 claim can be brought against the issuer of the securities, the issuer's directors or partners, the underwriters of the offering, and accountants named as having prepared or certified the registration statement.
>
> Section 12(a)(2) of the Securities Act creates a private cause of action against persons who offer or sell a security which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading. Section 12 liability extends to those who transfer title to the security and to those who successfully solicit the purchase.

*Ehlert v. Singer*, 245 F.3d 1313, 1315–16 (11th Cir.2001) (internal quotation marks and citations omitted). "Thus, in order to state a claim under §§ 11 and 12, Plaintiffs must allege [only] that there was a material misrepresentation or omission." *Id.* at 1316; *see also In re Newbridge Networks Sec. Litigation*, 767 F.Supp. 275, 278 (D.D.C.1991) ("To establish a *prima facie* case, plaintiffs need only show a material misrepresentation or omission."). It is important to observe that claims under §§ 11 and 12(a)(2) of the Securities Act do not require any intent to defraud on the part of the defendant, or even knowledge of the misrepresentation or omission. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Rather, these two provisions give effect to the basic purpose underlying the Securities Act—full disclosure to investors of pertinent information concerning the issuers of securities and the securities themselves—by imposing strict liability for material misinformation contained in a registration statement or prospectus. *See id.* at 382, 103 S.Ct. 683 (stating that liability under § 11 is "virtually absolute").

■ "The test for determining materiality is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir.1982). In assessing whether a misrepresentation or omission was material, courts may not employ 20/20 hindsight; instead, they must consider whether the misrepresentation or omission was material on the date the prospectus or registration statement was issued. *See Rudd v. Suburban Lodges of Am., Inc.*, 67 F.Supp.2d 1366, 1370

14. To the extent that the parties' arguments encompass identical requirements under both the Securities Act and the Exchange Act, the Court's discussion under a particular act shall be deemed applicable to the other.

(N.D.Ga.1999); *In re MobileMedia Sec. Litigation*, 28 F.Supp.2d 901, 924 (D.N.J. 1998). Materiality, though, is a question of fact that may rarely be resolved at the motion to dismiss stage. *See In re Twinlab Corp. Sec. Litigation*, 103 F.Supp.2d 193, 201 (E.D.N.Y.2000). "Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir.1997).

### 1. Have Plaintiffs Alleged a Material Misrepresentation or Omission?

■ Through their separate motions to dismiss, Defendants argue that the amended class action complaint fails, as a matter of law, to allege that Unicapital's prospectus and registration statement contained any material misrepresentations or omissions. The Court disagrees. As explained below, the amended class action complaint has (1) identified a material misrepresentation in the prospectus and registration statement and (2) alleged that material information was omitted.

First, the amended class action complaint asserts that the prospectus and registration statement materially misrepresented the value of the assets acquired by Unicapital through the roll-up of the targeted companies, by failing to account for the effect that the ANCA's December 31, 1999 conversion deadline would have upon the value of the acquired fleet of aircraft. More specifically, it is alleged that Unicapital overstated the aggregate amount of goodwill attributable to the roll-up of the targeted companies by at least $100 mil-

lion. *See* Amend. Compl. at ¶ 67 ("[Unicapital's] pro forma combined financial statements which were contained within the Prospectus ... fail to reflect the recognition of no less than a $100 million write-off of goodwill"); *see also id.* at ¶ 68. In other words, the prospectus and the registration statement overstated Unicapital's goodwill by approximately 20% and, consequently, its total assets by approximately 8%.[15] Such misstatements would presumably be important to a reasonable investor. *See In re Twinlab Corp. Sec. Litigation*, 103 F.Supp.2d at 202–03 (finding allegation that company failed to state, in its prospectus, that there had been " 'a material decline in the [c]ompany's retail' sales during the first quarter of 1998" sufficient to allege a material misrepresentation); *Carley Capital Group v. Deloitte & Touche, LLP*, 27 F.Supp.2d 1324, 1336 (N.D.Ga.1998) (finding allegations of false representations concerning company's earnings in financial reports sufficient to allege a material misrepresentation, for purposes of a Rule 10b–5 claim); *see generally Gaskins v. Grosse*, No. CV 481–387, Fed. Sec. L. Rep. (CCH) 99,105, 1983 WL 1282 (S.D.Ga. Jan. 31, 1983) ("I can think of nothing more critical to the average potential investor's ultimate decision to purchase securities than representations with regard to the worth of the company ...."). Because it cannot be said that no reasonable investor would attach importance to a $100 million, or 8%, overstatement of the assets in Unicapital's prospectus and registration statement, Plaintiff's averments concerning the overvaluation of Unicapital's goodwill sufficiently allege a material misrepresentation that is adequate to support a claim under §§ 11 and 12(a)(2) of the Securities Act.

---

**15.** To arrive at these percentages, the Court has utilized Unicapital's goodwill of $470,215,000.00 and total assets of $1,174,400,000.00 as of March 31, 1998, as reported in the pro forma financial statement in the prospectus and registration statement. *See* Prospectus at F–6; *see also supra* Part I(A)(1).

The amended class action complaint also asserts that the prospectus and registration statement failed to disclose that a significant portion of the fleet of aircraft that Unicapital was acquiring would become obsolete in less than two-years time. *See* Amend. Compl. at ¶ 59 ("[D]efendants knew and failed to disclose that [Unicapital's] inventory of aircraft and aircraft engines were, in significant part, not Stage 3 compliant and that, accordingly, such non-compliant equipment would cease to be leased by customers not later than December 31,1999."). As discussed above, it is Plaintiffs' theory of the case that Unicapital's principals knew that many of the aircraft that they were acquiring in May of 1998 were due to be phased out by December 31, 1999, by operation of the ANCA. Just as a reasonable investor would presumably be interested in the fact that Unicapital's goodwill was overstated by $100 million, a reasonable investor would also be interested in knowing that a significant portion of Unicapital's leasing inventory had a useful life-span of less than two years. *See Helwig v. Vencor, Inc.*, 251 F.3d 540 at 554–56 (6th Cir.2001) (en banc) (holding, where there was a strong inference that the defendants knew that *pending* legislation would "adversely affect their operations," the failure to disclose that information constituted a material omission) (emphasis supplied); *In re World Access, Inc. Securities Litigation*, 119 F.Supp.2d 1348, 1354–55 (N.D.Ga. 2000) (finding, inter alia, "allegations that Defendants deliberately provided public misinformation regarding the potential success of [a product,] which they knew to be inoperable" sufficient to state a material misrepresentation in a Rule 10b–5 case). Thus, the amended class action compliant sufficiently alleges a material omission

with respect to the failure to acknowledge the limited life-span of Unicapital's fleet of aircraft.

In sum, the amended class action complaint's allegations concerning (1) the misrepresentation of Unicapital's goodwill and (2) the omission of information concerning the useful life of Unicapital's aircraft are both sufficiently material to state a claim under §§ 11 and 12(a)(2) of the Securities Act.[16]

### 2. Who May the §§ 11 and 12(a)(2) Claims be Asserted Against Directly?

 The §§ 11 and 12(a)(2) claims of the amended class action complaint are captioned as being brought "[a]gainst [a]ll [d]efendants." Section 11 claims may be asserted against an array of individuals, namely:

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having pre-

---

**16.** This is not to say that either of the above noted allegations will ultimately be proven or found material by the trier of fact. However, at the motion to dismiss stage they suffice to

state a claim. *See Credit Suisse First Boston Corp. v. ARM Fin. Group*, No. 99 CIV 12046, Fed. Sec. L. Rep. (CCH) 91,363, 2001 WL 300733, at *9 (S.D.N.Y. Mar. 28, 2001).

pared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him; [and]

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a). Section 12(a)(2) claims, on the other hand, may only be asserted against a person who "offers or sells a security." 15 U.S.C. § 77l(a). The Securities Act does not explicitly define who may be held liable as an offeror/seller of securities under § 12(a)(2). In *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), though, the Supreme Court, interpreting identical language from § 12(a)(1),[17] clarified the reach of offeror/seller liability.[18] The Supreme Court ruled that inclusion of the term "offers," along with the term "sells," extended liability not only to those who actually pass title to the securities, but also to those who solicit the sale (i.e., brokers and the like). *See id.* at 642–44, 108 S.Ct. 2063; *Ehlert,* 245 F.3d at 1316. Thus, § 12(a)(2) liability effectively extends to any individual that may be described as a purveyor of materially misrepresented securities, whether or not that individual was a formal party to the contract for the sale of the securities.[19] *See Pinter,* 486 U.S. at 643, 108 S.Ct. 2063.

In the present case, the Underwriters are plainly subject to both § 11 and § 12(a)(2) liability. With respect to the § 11 claim against the Individual Defendants, Jonathan New and Robert New are subject to liability because they signed the registration statement as directors of Unicapital,[20] *see* 15 U.S.C. § 77k(a)(1), and Stuart Cauff is subject to liability as a person "named in the registration statement as being or about to become a director, person performing similar functions, or partner."[21] 15 U.S.C. § 77k(a)(3). The Individual Defendants, however, may not be subjected to § 12(a)(2) liability as they were not pur-

---

**17.** At the time of the *Pinter* decision, § 12(a)(1) was numbered as § 12(1) and § 12(a)(2) was numbered § 12(2).

**18.** The Court is cognizant that, in *Pinter,* the Supreme Court reserved on the question of whether or not the identical "offers or sells" language in the two subsections of § 12 should be given the same interpretation. *See* 486 U.S. at 643 n. 20, 108 S.Ct. 2063. The Eleventh Circuit, though, subsequently adopted the *Pinter* offeror/seller definition for § 12(a)(2) claims. *See Ryder Int'l Corp. v. First Am. Nat'l Bank,* 943 F.2d 1521, 1526–30 (11th Cir.1991).

**19.** As the Supreme Court noted in *Pinter,* though, a claimant is limited to seeking recourse from those involved in the actual resale of the securities to him. *See* 486 U.S. at 644 n. 21, 108 S.Ct. 2063 ("[L]iability [is imposed] on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller.").

**20.** Robert New signed the registration statement for himself on May 14, 1998. Additionally, he signed the registration statement for Unicapital's other directors, including Jonathan New, pursuant to powers of attorney filed with the registration statement.

**21.** The prospectus, which was incorporated into the registration statement, provided: "Stuart Cauff, the President of Cauff Lippman will become President and CEO of Unicapital's Big Ticket Leasing Division and will enter into a three-year employment agreement with the Company and a subsidiary of the Company that will operate the Cauff Lippman business after the Merger...." Prospectus at 103. Moreover, the amended class action complaint alleges that Stuart Cauff became a director of Unicapital shortly after the acquisition of the targeted companies. *See* Amend. Compl. at ¶ 13. Under these circumstance, Stuart Cauff qualifies as someone named in the registration statement about to become a person performing similar functions to a director, as contemplated by 15 U.S.C. § 77k(a)(3).

veyors of Unicapital stock. In light of the foregoing, to the extent the § 12(a)(2) claim (Count II) is asserted directly against the Individual Defendants, it is due to be dismissed.

*3. May the Individual Defendants be Subjected to Controlling Person Liability for the §§ 11 and 12(a)(2) Claims*

 Count III of the amended class action complaint seeks to impose controlling person liability upon the Individual Defendants for the alleged §§ 11 and 12(a)(2) violations. Section 15 of the Securities Act provides:

**Liability of controlling persons**

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections [11, 15 U.S.C. § 77k or 12, 15 U.S.C. § 77*l*,] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77*o*. In order to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the

general affairs of the entity primarily liable for the § 11 or § 12 violation at the time of the violation and (2) the power to control or influence the specific policy that resulted in primary liability under § 11 or § 12. *See Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir.1996).[22] Naturally, if there is no primary violation under § 12 or § 11, there can be no vicarious liability under § 15. *See id.* at 396–97.

 The § 15 controlling person claim against the Individual Defendants is premised upon their alleged control of Unicapital and Unicapital's alleged violations of the Securities Act. *See* Amend. Compl. at ¶ 203 ("Each of the Individual Defendants was a control person at Unicapital...."). Under § 11, an issuer of securities, such as Unicapital, is strictly liable for material misrepresentations and omissions contained in its registration statement. *See Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir.1993) ("Issuers are absolutely liable for material misstatements or omissions made under § 11 of the 1933 Act."). Therefore, the discussion above as to material misrepresentations and omissions applies equally to establish a prima facie § 11 violation against Unicapital. *See supra* Part II(A)(1). As the amended class action complaint adequately pleads (1) a primary § 11 violation by Unicapital (the controlled person) and (2) that Robert New and Jonathan New exercised control over Unicapital at the time of the primary violation and had the power to control the primary violation, Plaintiffs have stated a § 15 controlling person claim

---

**22.** *Brown v. Enstar Group, Inc.,* in which the Eleventh Circuit announced the test for controlling person liability to be applied in this circuit, involved controlling person liability under § 20(a) of the Exchange Act, rather than § 15 of the Securities Act. The controlling person analysis under § 15 of the Securities Act and § 20(a) of the Exchange Act, however, is identical. *See Pharo v. Smith,*

621 F.2d 656, 673 (5th Cir.) ("Section 20(a) is an analogue of section 15 of the Securities Act. Therefore, we give the two sections the same interpretation.") (citation omitted), *amended by* 625 F.2d 1226 (5th Cir.1980); *see also Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1578 (9th Cir.1990) ("Although § 15 is not identical to § 20(a), the controlling person analysis is the same.").

with respect to § 11 against Robert New and Jonathan New.[23] As for Stuart Cauff, though, it is undisputed that he was not a director or principal of Unicapital at the time of the alleged, primary § 11 violation. When the allegedly misleading registration statement was issued, Stuart Cauff was not part of Unicapital's management; he was still associated with Cauff Lippman, one of the targeted companies. Under these circumstances, he could not have exercised control over Unicapital. The controlling person claim (Count III) with respect to § 11 must therefore be dismissed against Stuart Cauff.

With regard to controlling person liability for a § 12(a)(2) violation, there is no allegation that the Individual Defendants exercised, or had authority to exercise, control over the Underwriters—the entities allegedly responsible for the primary § 12(a)(2) violation. Control over the entity responsible for the primary violation is essential element of a claim for controlling person liability. Thus, to the extent the controlling person claim (Count III) seeks to impose vicarious liability upon the Individual Defendants for the alleged § 12(a)(2) violation, it must dismissed.[24]

### 4. Do the Class Members Lack Standing to Pursue the §§ 11 and 12(a)(2) Claims?

 Defendant Stuart Cauff argues that the §§ 11 and 12(a)(2) claims must be dismissed for lack of standing because "the lead plaintiffs did not purchase their Unicapital stock in the actual offering of securities, but in the secondary market." According to Cauff, "[l]iability under Sections 11 and 12(a)(2) of the Securities Act is limited to persons who purchase securities in a public offering." Cauff's argument conflates §§ 11 and 12(a)(2).[25] "[W]hile Section 11 and Section 12 are indeed parallel statutes, their wording is significantly different as to who can bring a suit." *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1081 (9th Cir.1999). Section 12 restricts to whom the seller of a violative

---

**23.** The key variable in the controlling person inquiry—whether an individual defendant can be said to have the requisite control over the corporation—is a fact intensive issue. *See Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F.Supp. 1260, 1268 (S.D.Fla.1995). Thus, the disposition of controlling person liability is most appropriate at the summary judgment stage. *See id.*

**24.** With respect to this claim, Unicapital does not satisfy the requirements for primary liability, since it was not an offeror or seller of the securities. *See supra* Note 19.

**25.** Cauff cites some district court authority to support his position that § 11, like § 12(a)(2), provides a cause of action only for those claimants who purchased the securities in the initial public offering. *See, e.g. In re Summit Medical Sys., Inc. Sec. Litigation,* 10 F.Supp.2d 1068 (D.Minn.1998). Those cases, however, are at odds with the courts of appeal that have considered the issue and have

uniformly recognized the broader statutory language of § 11. *See Joseph v. Wiles,* 223 F.3d 1155 (10th Cir.2000); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076; *Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653 (1st Cir. 1992). Indeed, there is authority from the former Fifth Circuit, whose decisions represent binding precedent in this circuit, that is contrary to the position advanced by Cauff. *See Columbia Gen. Inv. Corp. v. S.E.C.,* 265 F.2d 559, 562 (5th Cir.1959). Interestingly, Cauff failed to disclose the existence of any of the appellate authorities contrary to his position. In support of his position, Cauff also cited generally and without discussion the Supreme Court's *Gustafson v. Alloyd Co., Inc.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), decision. *Gustafson,* though, is inapposite because it addressed whether secondary purchasers may assert a claim under § 12(a)(2), not § 11 the more broadly worded statute.

security may be liable. Specifically, the seller's liability is limited to "the person purchasing such security *from him.*" 15 U.S.C. § 77*l*(a) (emphasis supplied). "This is an express privity requirement, giving a cause of action only to individuals who purchase securities directly from a person who sells the securities by means of a prospectus." *Joseph v. Wiles,* 223 F.3d at 1161. Thus, in order to have standing under § 12, "a plaintiff must have purchased the security directly from the issuer of the prospectus." *Hertzberg,* 191 F.3d at 1081.

■ On the other hand, § 11 contains no privity requirement as to who may maintain an action. Rather, § 11 provides that "*any person* acquiring such security" may bring suit. 15 U.S.C. § 77k(a) (emphasis supplied). As the Ninth Circuit explained, "Congress's decision to use 'from him' in Section 12 but not in Section 11 must mean that Congress intended a different meaning in the two sections." *Hertzberg,* 191 F.3d at 1081; *see also Joseph v. Wiles,* 223 F.3d at 1161 ("We must assume that Congress intended the two sections to be interpreted differently."). In order to have standing under § 11, one must simply be able to trace the purchase of his securities to the registration statement that allegedly violated § 11 (i.e., contained a material misrepresentation or omission). *See Adair v. Bristol Tech. Sys., Inc.,* 179 F.R.D. 126, 133 (S.D.N.Y.1998).

Here, all of the shares of Unicapital stock are traceable to the May 14, 1998 registration statement; therefore, all of the class members have standing to maintain the § 11 claim against Cauff and the other defendants. As for the § 12(a)(2) claim, which may only be maintained against the Underwriters (i.e., the sellers of securities), those class members who did not purchase their shares directly from one of the Underwriters will not be allowed to participate in the claim because they lack standing to maintain a cause of action under § 12. Which plaintiffs may participate in the § 12(a)(2) claim, though, shall be resolved at the class certification stage, when the direct purchasers and secondary purchasers can be segregated into appropriate subclasses.

In accordance with the analysis and rulings set forth in this section, the § 11 claim will proceed against the Individual Defendants and the Underwriters, the § 12(a)(2) claim will proceed against the Underwriters (only for those class members who purchased their shares of Unicapital stock in the initial public offering), and the § 15 controlling person liability claim will proceed against Robert New and Jonathan New with respect to the § 11 claim.

**B. The Exchange Act Claims**

■ Count IV of the amended class action complaint asserts a securities fraud claim, pursuant to § 10(b) of the Exchange Act and SEC Rule 10b–5, against the Individual Defendants and the Underwriters. Additionally, Count V seeks to impose controlling person liability upon the Individual Defendants pursuant to § 20(a) of the Exchange Act. "To allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which [the] plaintiff relied, 5) that proximately caused his injury." *Bryant v. Avado Brands, Inc.,* 187 F.3d at 1281. The motions to dismiss primarily argue that the amended class action complaint fails to state a claim under Rule 10b–5 because the element of scienter is not pled with the requisite specificity needed to satisfy the heightened pleading requirement imposed

by the Private Securities Litigation Reform Act of 1995 (hereinafter the "PSLRA"), 15 U.S.C. § 78u–4 et seq. The motions to dismiss also raise two defenses to the Rule 10b–5 claim: (1) truth on the market and (2) the PSLRA's codification of the bespeaks caution doctrine, 15 U.S.C. § 78u–5. Each of these arguments will be addressed below.

### 1. The PSLRA's Pleading Requirement: Scienter

The Federal Rules of Civil Procedure have long required that allegations of fraud be pleaded with "particularity." *See* Fed.R.Civ.P. 9(b) ("[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake be stated with particularity"). "The purpose behind Rule 9(b)'s specificity requirement is to eliminate fraud actions in which all of the facts are learned through discovery after the complaint is filed." *Arral Indus., Inc. v. Touch Ent., Inc.,* No. 99–0916–CIV–HIGHSMITH, 2000 WL 141269, at *3 (S.D.Fla. Jan. 18, 2000) (internal quotation marks and citation omitted). In pre-PSLRA securities fraud cases, Rule 9(b) required that the complaint state "the who, what, when, where, and how [of the alleged fraud]: the first paragraph of any newspaper story." *Di-Leo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (Easterbrook, J.) These requirements alone, however, proved ineffective in curtailing vexatious securities litigation. *See In re Comshare Inc. Sec. Litigation,* 183 F.3d 542, 548 (6th Cir. 1999) ("Despite the application of the Rule 9(b) heightened pleading requirement to securities fraud cases, the Supreme Court recognized long ago that

'litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and kind from that which accompanies litigation in general.' ") (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 739–44, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). Therefore, Congress amended the Exchange Act, through the PSLRA, to require:

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (emphasis supplied). "The 'required state of mind' in § 78u–4(b)(2) refers to the scienter requirement applicable to the underlying securities fraud claim...." *In re Silicon Graphics, Inc. Sec. Litigation,* 183 F.3d 970, 975 (9th Cir.1999). Thus, beyond the who, what, when, where, and how of the alleged fraud, a complaint pleading securities fraud must now also plead the mens rea of the cause of action with specificity.[26] *See Bryant v. Avado Brands, Inc.,* 187 F.3d at 1282 ("[I]t is clear after the [PSLRA] that scienter can no longer be averred generally.").

The Supreme Court has defined the level of scienter necessary to support a Rule 10b–5 claim as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Eleventh Circuit

---

**26.** In other words, the complaint must now not only allege the who, what, when, where, and how of the fraud, but also *the why* of the fraud.

has construed this definition, after the PSLRA, to encompass allegations of "severe recklessness."[27] *See Bryant v. Avado Brands, Inc.*, 187 F.3d at 1282–84. As the former Fifth Circuit explained, in the securities context:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961–62 (5th Cir. 1981) (en banc).[28] In order to comply with the heightened plead-ing requirement of the PSLRA, the amended class action complaint must describe how the defendants acted with severe recklessness in relation to the alleged material misrepresentations and omissions.[29]

In the present case, the amended class action complaint fails to allege that the Underwriters acted with severe recklessness. The only allegation bearing upon state of mind with respect to the Underwriters is that their "due diligence" investigation of Unicapital was inadequate. *See* Amend. Compl. at ¶ 23. At most, this amounts to inexcusable negligence, which, as noted above, does not constitute severe recklessness. *See In re Lason, Inc. Sec. Litigation*, 143 F.Supp.2d 855, at 860–61 (E.D.Mich.2001). The Exchange Act claim (Count IV) is therefore dismissed with re-

---

**27.** Prior to passage of the PSLRA, every circuit to address the issue "held that a showing of recklessness was sufficient to allege scienter." *Bryant v. Avado Brands, Inc.*, 187 F.3d at 1284. Following the PSLRA, the courts of appeal have reached various conclusions as to what is sufficient to plead scienter under § 78u–4(b)(2). *See Bryant v. Avado Brands, Inc.*, 187 F.3d at 1282–83 (discussing the various interpretations of the PSLRA given by the courts of appeals); Scott H. Moss, Comment, *The Private Securities Litigation Reform Act: the Scienter Debacle*, 30 Seton Hall L.Rev. 1279 (2000) (same).

**28.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

**29.** As discussed above with respect to the Securities Act claims, the amended class action complaint sufficiently pleads material misrepresentations and omissions concerning the value of Unicapital's goodwill and the useful life of its fleet of aircraft. The amended class action complaint further alleges that the misrepresentations and omissions continued in (1) Unicapital's quarterly 10–Q and annual 10–K filings with the SEC, *see* Amend. Compl. at ¶¶ 94, 104, 111, 123, 132, 148, 151, 152, and (2) press releases and shareholder reports. *See, e.g., id.* at ¶¶ 88, 98–101. Those allegations are sufficient to establish the who, what, when, where, and how of the alleged fraud and to satisfy Rule 9(b)'s requirement. *See Arral Indus., Inc.*, 2000 WL 141269, at *3 ("Rule 9(b) is satisfied when the complaint alleges fraud with sufficient particularity to permit the person charged with fraud to have a reasonable opportunity to answer the complaint and adequate information to frame a response.") (internal quotation marks and alterations omitted).

The alleged misrepresentations and omissions that followed the prospectus and registration statement are of particular import with respect to the Rule 10b–5 claim against Defendant Stuart Cauff. Mr. Cauff was not a director at the time the registration statement was signed and the prospectus was issued; thus, he could not be directly liable, under Rule 10b–5, for the alleged misrepresentations and omissions contained in those documents. He was, however, a director at the time of the later, alleged misrepresentations and omissions. In fact, several of the allegedly fraudulent statements are attributable to Mr. Cauff.

spect to the Underwriters. The dismissal of this claim against the Underwriters is without prejudice to its amendment to state a viable claim (i.e., allege facts sufficient to establish severe recklessness) within ten days of this order.

 As for the Individual Defendants, the allegations of the amended class action complaint, when viewed in the light most favorable to Plaintiffs, sufficiently allege severe recklessness.[30] As discussed above, the gravamen of the amended class action complaint is that the Individual Defendants knew that the ANCA would render Unicapital's fleet of aircraft effectively useless as of December 31, 1999. Plaintiffs allege that, despite the Individual Defendants' knowledge of the ANCA's looming deadline for phasing out stage 2 aircraft, and the devastating effect this would have upon Unicapital, they omitted this information from all SEC filings and public statements. Moreover, Plaintiffs assert that the Individual Defendants substantially misrepresented the value of Unicapital's fleet, by valuating the stage 2 aircraft to have a useful life of up to 40 years. The alleged omissions and misrepresentations by the Individual Defendants are analogous to those found by the Second Circuit to support a strong inference of fraudulent intent in *Cosmas v. Hassett,* 886 F.2d 8 (2d Cir.1989).[31]

The *Cosmas* case arose from the decline of Inflight Services, Inc., a corporation that was largely dependent upon sales to the Peoples Republic of China (the "PRC") for its viability. *See id.* at 9. In 1985, the PRC imposed import restrictions that significantly impacted upon Inflight Services, Inc.'s sales. *See id.* at 9–10. As a result of its lost sales, Inflight Services, Inc. was forced to take a $2.5 million write down of its inventory in 1986, and to file subsequently for bankruptcy. *See id.* at 10–11. On appeal, the Second Circuit reversed the dismissal of a securities fraud action, finding that, where it was alleged that the directors (a) had knowledge of the PRC's trade restrictions and (b) failed to disclose the detrimental impact such restrictions would have upon Inflight Services, Inc.'s sales, the complaint adequately pleaded scienter through severe recklessness. *See id.* at 13; *see also Novak,* 216 F.3d at 308 (discussing when severe recklessness is established by allegations that the defendants had "knowledge of facts or access to information contradicting their public statements"). Similarly, it is alleged in the present case that the Individual Defendants had (a) knowledge of the detrimental effect that the ANCA's December 31, 1999 drop-dead date would have upon Unicapital and (b) failed to disclose that information and failed to account for it in their SEC filings and public statements. These allegations rise to the level of severe recklessness. Thus, the PSLRA's scienter pleading requirement is satisfied with respect to the Individual Defendants.

---

**30.** It is important to observe that the PSLRA, although mandating more particular pleading, in no way altered the standard of review applicable to the well pleaded allegations of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure (i.e., the allegations are viewed in the light most favorable to the plaintiff). *See Helwig* 251 F.3d at 553–54 (discussing the interplay of the PSLRA's heightened pleading requirements and Rule 12(b)(6)).

**31.** *Cosmas* is a pre-PSLA case. The Second Circuit's pre-PSLRA pleading requirements, though, included the pleading of scienter with particularity in securities fraud cases; therefore, *Cosmas* is still good law as to what must be pled to establish scienter through severe recklessness. *See Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000).

### 2. Truth on the Market

 The motions to dismiss argue that the Rule 10b–5 claim is barred under the truth on the market defense.[32] Under this doctrine (a corollary to the fraud on the market theory), an omission or "a misrepresentation is immaterial if the information is already known to the market because the [omission or] misrepresentation cannot then defraud the market." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir.2000). In their motions to Dismiss, the Individual Defendants argue that, because the ANCA is a federal statute, the market must be deemed to have had knowledge of the December 31, 1999 drop-dead date for stage 2 aircraft and, therefore, the failure to account for the effect of the drop-dead date is immaterial. This argument misses the mark as to what was allegedly not disclosed or accounted for by Unicapital. What was germane, and what the Individual Defendants allegedly failed to disclose, was not merely the existence of the ANCA, but the adverse impact it would have upon Unicapital's fleet of aircraft and, consequently, its operations. This specific information was not available to the public. Hence, the truth on the market defense is inapplicable.

### 3. Safe Harbor

 As noted above, the PSLRA codified a version of the bespeaks caution doctrine in what is referred to as the safe-harbor provision. *See* 15 U.S.C. § 78u–5; *see also Bryant v. Avado Brands, Inc.*, 187 F.3d at 1276 n. 7 (describing the bespeaks caution doctrine as "the safe harbor's judicially created counterpart, [which] operates similarly, protecting statements in the nature of projections that are accompanied by meaningful cautionary statement and specific warnings of the risks involved"). Under this provision, certain forward-looking statements are immune from liability if they are accompanied by appropriate cautionary language.[33] *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). The theory for exempting such statements from liability is that the cautionary language renders any misrepresentation or omission immaterial. *See In re Donald J. Trump Casino Sec. Litigation*, 7 F.3d 357, 371 (3d Cir.1993). Of particular importance to the issues in this case, though, certain categories of statements are ineligible for protection under the safe-harbor provision, including: (1) statements made in connection with a roll-up transaction; (2) statements contained in a registration statement or otherwise issued by an investment company; (3) statements made in connection with an initial public offering; and (4) financial statements prepared in accordance with generally accepted accounting principles. *See* 15 U.S.C. §§ 78u–5(b)(1)(D), 78u–5(b)(2)(A),(B),(D). Thus, the primary statements and omissions at issue in this case (i.e., the valuation statements in the

---

32. Because the Court finds that the truth on the market defense is inapplicable, it need not decide whether it is a viable defense to the Securities Act claims, as well as the Exchange Act claim.

33. Forward-looking statements may also be immunized from liability if they (1) are immaterial or (2) the plaintiff fails to prove that the maker of the statement knew it was false when made. *See* 15 U.S.C. § 78u–5(c)(1)(A)(ii),(B). As discussed above, the al-

leged misrepresentations and omissions at issue here are material. With respect to the Individual Defendants' knowledge, the amended class action complaint sufficiently alleges that the Individual Defendants had knowledge of the ANCA and the effect it would have upon Unicapital's fleet of aircraft at the time of the alleged misrepresentations and omissions.

registration statement, the prospectus, and the 10–Q and 10–K filings) are not protected by the PSLRA's safe-harbor provision.

 The statements in the amended class action complaint that are eligible for the safe-harbor provision's protection are quotations from various Unicapital press releases. *See generally* Amend. Compl. at ¶¶ 88–164. In determining whether these statements are protected from liability, the "threshold question is whether . . . [they] constitute[ ] . . . forward looking statement[s] subject to the PSLRA safe-harbor." *Ehlert*, 245 F.3d at 1316. A forward-looking statement is something "in the nature of [an] economic forecast[ ]." *Bryant v. Avado Brands, Inc.*, 187 F.3d at 1276 n. 7; *see also* 15 U.S.C. § 78u–5(i)(1) (listing the types of forward looking statements). The vast majority of the segments from the press releases quoted in the amended class action complaint are not forecasts; they are comments on and analyses of Unicapital's past performance. As the Eleventh Circuit has explained, however, in assessing whether statements are subject to the forward-looking safe-harbor provision, a line or paragraph referenced in a complaint must be viewed in the context in which it was made, rather than standing alone as presented in the complaint. *See Harris v. Ivax Corp.*, 182 F.3d 799, 806–07 (11th Cir.1999), *reh'g and reh'g en banc denied*, 209 F.3d 1275 (11th Cir.2000). If a review of the entire statement, as opposed to an isolated line or two, reveals that it is a mixed-statement (i.e., it contains both his-

torical observations and prognostications based upon those observations) the entire statement qualifies as forward-looking for purposes of the PSLRA's safe-harbor provision. *See id.* When viewed in their entirety, the press releases quoted in the amended class action complaint are mixed statements;[34] thus, they must be considered forward-looking statements eligible for the safe-harbor provision.

 As for these forward-looking statements, it must be determined whether they are shielded from liability by the safe-harbor provision. *See Ehlert*, 245 F.3d at 1318 ("After having determined that the statement is forward looking, and thus the safe-harbor provision applies, the next step in the analysis is to determine whether the statement is protected by the safe-harbor."). To be exempt from liability the press releases must have been (1) identified as forward-looking and (2) accompanied by meaningful cautionary language identifying factors that could materially affect the prognostications. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). To qualify as "meaningful cautionary" language, a statement's warning must advise investors of "risks of a significance similar to that actually realized." *Ivax*, 182 F.3d at 807. This does not require a direct connection between the disclaimer and the events that subsequently lead to the company's decline; however, there needs to be some correlation between the disclaimer and the subsequent events. *See Kline v. First W. Gov't Sec., Inc.*, 24 F.3d 480, 489 (3d Cir.1994) ("Not just any cautionary language will

---

**34.** Not all of the press releases quoted in the amended class action complaint have been furnished to the Court by the parties. The Court could not consider whether the press releases that the parties failed to provide are eligible for the PSLRA's safe harbor. In any event, it appears that *all* of Unicapital's press

releases contained the same warnings, which, as discussed in the text, the Court finds inadequate to immunize the statements. With respect to the press releases not furnished to the Court, the Individual Defendants are free to raise the safe-harbor defense at the summary judgment stage, if appropriate.

trigger application of the [bespeaks caution] doctrine. Instead, disclaimers must relate directly to that on which the investors claim to have relied.").[35] In other words, the warning need not explicitly describe the particular happenings that ultimately come to pass, but it must be sufficient to put a reasonable investor on notice of the potential that something similar to those happenings could occur. To provide immunity, a warning effectively needs to render any misrepresentation or omission immaterial.

Here, the warnings contained in Unicapital's press releases contained little more than generic, boilerplate language. For example, the July 10, 1998 press release provides:

> Certain statements made in this press release (including, without limitation, statements regarding the possible implementation and timing of our e-business initiatives and the effects of such initiatives on our business, the possible parties with which we may partner or agree to pursue any e-business initiatives, and possible future lease originations) may be deemed to be forward-looking statements that involve risks and uncertainties. . . . Those risk factors include the absence of combined operating history for the Company and its subsidiaries, risks associated with the Company's ac-

quisition strategy and the financing of acquisitions, risks related to internal growth and operating strategies, risks related to the need for additional capital, interest rate risks, risks related to fluctuations in quarterly operating results, risks related to consummating securitization transactions and other risks. These risks and other factors could cause actual results to differ materially from those expressed or implied in any forward looking statements contained in this press release. . . .

There is no mention of the risk that a then existing federal statute, the ANCA, could dramatically and negatively impact upon the operations of Unicapital and the value of its assets. Nor is there any factor listed that could provide reasonable notice of such a risk. The effect of the ANCA's December 31, 1999 drop-dead date for stage 2 aircraft, and the failure to account for or disclose it, is the gist of Plaintiffs' theory of securities fraud in this case. Unicapital's press releases contained no warning or disclaimer providing notice of a risk of a significance similar to that allegedly realized in this case—the detrimental effect of the ANCA.[36] Thus, the safe-harbor provision does not immunize the press releases.

### 4. Controlling Person Claim

In addition to the Rule 10b–5 claim, Count V of the amended class action com-

---

**35.** The Eleventh Circuit's standard for "meaningful cautionary" language, as articulated in *Ivax*, is unquestionably somewhat more lenient (i.e., easily satisfied) than the standard employed by the Third Circuit. *See generally In re Columbia Labs., Inc. Sec. Litigation*, 144 F.Supp.2d 1362 at 1369 (S.D.Fla.2001) (noting the "more liberal approach" the Eleventh Circuit has taken with respect to the term "meaningful"). Even under the Eleventh's Circuit's standard, though, there must be some similarity between the nature of the disclaimer and the hazzard that ultimately befalls the company. *See id.*

**36.** To the extent that the motions to dismiss rely upon the bespeaks caution doctrine as distinct from the PSLRA's safe-harbor provision, the statements do not qualify for protection under that doctrine for the same reason (i.e., the warnings provided no notice of the hazzard). *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 182–83 (3d Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1091, 148 L.Ed.2d 965 (2001).

plaint asserts a claim for controlling person liability under § 20(a) of the Exchange Act against the Individual Defendants. As noted above, vicarious liability under § 20(a) of the Exchange Act is measured by the same standard as vicarious liability under § 15 of the Securities Act. *See supra* Note 22. Count V adequately pleads a claim for controlling person liability against the Individual Defendants under § 20(a) of the Exchange Act; i.e., its alleges (1) a Rule 10b–5 violation by Unicapital (the controlled person) and (2) that the Individual Defendants exercised control over Unicapital and had the power to control the Rule 10b–5 violation.

As explained above, the Exchange Act claim (Count IV) of the amended class action complaint is due to be dismissed against the Underwriters. That claim and the controlling person liability claim, though, will proceed against the Individual Defendants.

### III. CONCLUSION

At the center of this securities case is the allegation that the structure of Unicapital was, from the start, a sham. More specifically, the amended class action complaint asserts that Unicapital's principals and directors intentionally turned a blind eye to the reality that the fleet of aircraft they acquired would become obsolete as of December 31, 1999, by operation of the ANCA. The failure to account for this anticipated event allegedly resulted in Unicapital's precipitous decline and ultimate demise, when the economic reality of the ANCA's impact was revealed on May 15, 2000. As set forth above, the allegations of the amended class action complaint are sufficient to (1) state claims under §§ 11 and 12(a)(2) of the Securities Act against the Underwriters; (2) state a direct claim under § 11 of the Securities Act against the Individual Defendants, as well as a controlling person liability claim under § 15 of the Securities Act against Robert New and Jonathan New; and (3) state a direct claim pursuant to § 10(b) of the Exchange and SEC Rule 10b–5, as well as a controlling person liability claim under § 20(a) of the Exchange Act, against the Individual Defendants.

In accordance with the rulings set forth in this order, it is hereby ORDERED that the motions to dismiss are GRANTED IN PART and DENIED IN PART, as follows:

(1) Count II is DISMISSED with respect to the Individual Defendants;

(2) Count III is DISMISSED with respect to Stuart Cauff

(3) Count III is DISMISSED to the extent that is seeks to impose vicarious liability upon Robert New and Jonathan New for the Underwriters' alleged violation of § 12(a)(2);

(4) Count IV is DISMISSED with respect to the Underwriters;

(5) Plaintiffs have leave to amend Count IV within ten days of this order to state a viable claim against the Underwriters;

(6) Defendants shall file their answers within fifteen days after the date allowed for Plaintiffs to amend Count IV;

(7) the separate motions to dismiss are DENIED in all other respects; and

(8) all requests for oral argument are DENIED.

A status conference in this matter will be set by separate order.