Joseph and Patricia **MARRARI**, Jerome **Gould**, and Tommie L. **Williams**, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

**MEDICAL STAFFING NETWORK HOLDINGS, INC., et al.,** Defendants.

No. 04–80158–CV.

United States District Court, S.D. Florida.

Sept. 27, 2005.

Blaskey, Tariq Mundiya, Eric Andrew Greenwald, Stanley Howard Wakshlag, Akerman Senterfitt, Miami, FL, Brian Paul Miller, Snow, Christensen & Martineau, Salt Lake City, UT, for Defendants.

## ORDER GRANTING, IN PART, MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT; AND GRANTING LEAVE TO AMEND

DIMITROULEAS, District Judge.

THIS CAUSE is before the Court upon the Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [DE 42]. The Court has carefully considered the Motion, Defendants' Amended Memorandum of Law in Support of the instant Motion [DE 56], Plaintiffs' Corrected Response [DE 63], Defendants' Reply [DE 64], and is otherwise fully advised in the premises.

## I. BACKGROUND

On September 4, 2004, Plaintiffs filed a four-count Consolidated Amended Class Action Complaint ("Complaint") alleging that Defendant Medical Staffing Network Holdings, Inc. ("MSN"), a supplemental healthcare staffing company, and several of its top officers [1] violated federal securities law. In particular, the Plaintiffs allege that the Defendants violated Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b–5 promulgated by the Securities and Exchange

Maya Susan Saxena, Milberg Weiss Bershad Schulman, Boca Raton, FL, for Plaintiffs.

Stephen W. Greiner, Willkie Farr & Gallagher, New York, NY, Sharon M.

---

1. The individual Defendants are Robert J. Adamson ("Adamson"), MSN's President, Chief Executive Officer, and a Director during the class period; Kevin S. Little ("Little"), MSN's Chief Financial Officer and a Director during the class period; Joel Ackerman ("Ackerman"), a Director of MSN during the class period; David J. Wenstrup ("Wenstrup"), a Director of MSN during the class period; and Scott Hillinski ("Hillinski"), a Director of MSN during the class period (collectively the "individual Defendants").

Commission ("SEC") under the Exchange Act.

The Complaint alleges that MSN and its top officers violated the Securities Act by disseminating a Registration Statement and Prospectus in connection with MSN's Initial Public Offering ("IPO") that contained misleading material facts and omitted other material facts. According to the Plaintiffs, each of the individual Defendants signed the Prospectus, and thus is strictly liable for any misleading or omitted material facts. Specifically, Plaintiffs allege the Registration Statement and Prospectus depicted MSN's *de novo* program, a key element in the company's growth strategy, as being financially successful when in fact that program was not generating positive growth and was only making fifty-percent of its projections. Plaintiffs further contend that the Registration Statement and Prospectus mislead investors by stating that a specialized set of criteria was utilized in expanding the *de novo* program; when the expansion of the program was in fact haphazard with the company hiring people simply because they were the first to apply, and opening new branches in locations only because the cities appeared in large print on maps. According to the Plaintiffs, all Defendants are liable under Section 11 of the Securities Act for the misleading and omitted material facts contained in the Registration Statement and Prospectus, while the individual Defendants are liable as controlling persons of MSN pursuant to Section 15 of the Securities Act.

In addition, the Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b–5 during the class period, from April 18, 2002 through June 16, 2003, when MSN and certain top officers [2] mislead investors by misrepresenting and falsifying the company's earnings releases and periodic reports filed with the SEC subsequent to the IPO, all at a time when MSN's top officers must have known, or were severely reckless in not knowing, of significant adverse pressures on the true financial condition of the company. Turning to the specifics of the Exchange Act counts, Plaintiffs alleges the following misleading statements or omissions:

— On April 18, 2002, MSN's Prospectus was filed with the SEC and stated that the *de novo* branches generated rapid revenue, that the *de novo* program was successful because of a strategy that enabled MSN to expand its presence quickly and efficiently enter new markets, and that there was a risk that revenue growth would be adversely affected if MSN's ability to open *de novo* branches became impaired. (*Complaint* ¶¶ 95–96; 100).

— On May 13, 2002, MSN released a press release that indicated that MSN had achieved "record results." Plaintiffs allege that when commenting on these results Defendant Adamson stated that MSN was very pleased with the strength of its first quarter 2002 results that reflect MSN's significant growth. (*Id.* ¶¶ 209–10).

— On May 30, 2002, MSN filed its quarterly report with the SEC on form 10–Q, which was signed by Defendants Adamson and Little, and reiterated the financial results released in the May 13, 2002 press release. (*Id.* ¶¶ 211).

— On July 30, 2002, MSN announced in a press release its financial results for the period ending in June 30, 2002. (*Id.* ¶ 213). At the same time, MSN issued a guidance that touted its "on track" *de novo*

---

**2.** Plaintiffs only assert the Exchange Act counts against MSN and individual Defendants Adamson and Little.

openings as part of its success, and Defendant Adamson stated that MSN's growth substantially exceeds even the market growth rate. (*Id.* ¶¶ 213–18).

— On August 7, 2002, MSN issued a press release stating that it was "very comfortable" with the earnings guidance it had reported in its second quarter earnings release issued on July 30, 2002. In the August 7, 2002 press release Defendant Adamson projected MSN's net income for 2003 to be $0.90 and $0.92 per share. (*Id.* ¶ 219).

— On August 14, 2002, MSN filed its quarterly report with the SEC on Form 10–Q, in which MSN reaffirmed its previously announced financial results. (*Id.* ¶¶ 219–21).

— On October 8, 2002, MSN issued a press release in which Defendant Adamson stated, "[w]e remain confident that the Company's earnings will be in line with previously issued guidance." (*Id.* ¶ 223).

— On October 29, 2002, MSN issued a press release announcing "record" financial results for the third quarter of 2002. Commenting on MSN's purported "record" results, Defendant Adamson stated that MSN's growth rate continues to exceed the growth rate of the overall market as well as that of other publicly-traded competitors in the *per diem* nurse staffing industry. (*Id.* ¶¶ 226–27).

— On October 30, 2002, MSN hosted an earnings conference call regarding its third quarter "record" results, and confirming its increased guidance for 2003. During this conference call Defendants Little and Adamson are alleged to have stated "[w]e believe that we can continue to expand our market leading positions through … our unparalleled success in opening new offices on a scale that is unmatched in this industry." (*Id.* ¶¶ 231–234).

— On November 11, 2002, MSN filed its third quarter report for 2002 with the SEC on Form 10–Q. This filing was signed by Defendants Adamson and Little, and reaffirmed MSN's previously announced financial results. (*Id.* ¶ 235).

— On January 31, 2003, MSN filed a Form 8–K and issued a related press release wherein Defendant Adamson attempted to calm investor's concerns about the bankruptcy of one of its large clients by stating that "demand for temporary healthcare staff remains robust …." (*Id.* ¶ 237).

— On February 18, 2003, MSN issued a press release announcing its fourth quarter and year-end results for the period ending on December 29, 2002. (*Id.* ¶ 239–43).

— On February 19, 2003, during an earnings conference call addressing the fourth quarter results for 2002, Defendant Adamson stated, "I guess we're trying to rationalize how [two large Travel Nurse companies] could go from a year ago or less than a year ago saying that they had five orders for every nurse that they had available to now finding themselves in a situation where demand is a problem … that would suggest that demand has fallen off by some eighty-percent. And our results obviously would suggest that the market has not gone that soft." (*Id.* ¶¶ 246–48).

— On March 28, 2003, MSN filed its annual report with the SEC on Form 10–K, which stated that the *de novo* branches "generated rapid revenue growth and typically achieved positive EBITDA … within six months of operation" and that MSN required its *per diem* applicants undergo a rigorous screening process. (*Id.* ¶¶ 252–254).

Plaintiffs allege that the foregoing company statements, along with the motive of

MSN and certain of its top officers to deceive the investing public by artificially inflating the price of the shares of MSN during the class period, combined with allegations that individual Defendants Adamson and Little had to have known, or were reckless in not knowing, that the company was facing financial difficulties and that projections were being manipulated to mislead investors, all add up to sustain a securities fraud case against the Defendants.

The Defendants have moved to dismiss the Complaint described above for failure to state a claim under either the Securities Act or the Exchange Act. As to the Securities Act counts, Defendants maintain that: (1) Plaintiffs have failed to plead facts supporting their claim that the IPO documents contained material misrepresentations or omitted material facts; (2) the "bespeaks caution" doctrine makes any misrepresentations or omissions in the IPO documents immaterial; (3) the allegations lack the requisite particularity requirements; and (4) control-person liability is lacking. As to the Exchange Act counts, Defendants argue that: (1) the allegations are simple mismanagement claims not securities fraud claims; (2) the Plaintiffs have failed to meet the scienter standard of severe recklessness; (3) the facts plead do not meet the requisite particularity standards; (4) any misleading statements are forward-looking statement protected by the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"); and (5) control-person liability is lacking.

## II. DISCUSSION

### A. Motion to Dismiss Standard

It is long settled that a complaint should not be dismissed unless it appears beyond a doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F.2d 332, 334–36 (11th Cir.1992) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir.1967)). Taking the Plaintiffs allegations to be true, the Court finds that their Complaint must nevertheless be dismissed, in part, because of a failure to state a claim upon which relief can be granted for portions of Counts III and IV.

"In determining whether to grant a Rule 12(b)(6) motion, the Court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Watson v. Bally Mfg. Corp.*, 844 F.Supp. 1533, 1535 n. 1 (S.D.Fla.1993), *aff'd*, 84 F.3d 438 (11th Cir.1996). When a plaintiff refers to documents in the complaint that are "central to the plaintiff's claims," the Court "may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require the conversion of the motion into a motion for summary judgment." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997). When deciding a motion to dismiss in a securities fraud case the Court "may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC." *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996). As such, in the present matter the Court will consider the allegations made in the complaint, those documents attached to or incorporated into

the complaint, and matters that can be judicially, noticed including SEC filings.

## B. Securities Act Counts

Counts I and II of the Complaint are brought pursuant to the Securities Act. Count I alleges that Defendants violated Section 11 of the Securities Act by disseminating a IPO materials containing misleading material facts or omitting material facts. Count II alleges that the Individual Defendants are liable pursuant to Section 15 of the Securities Act as control persons for the Section 11 violations. In the instant Motion, Defendants contend that both Counts I and II should be dismissed for failure to state a claim upon which relief may be granted. The Court disagrees.

### 1. Section 11 Count

Section 11 establishes a private cause of action where a registration materials "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k; *Herman & MacLean v. Huddleston,* 459 U.S. 375, 381, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case."). Plaintiffs allege in their Section 11 claim that the Prospectus issued in conjunction with MSN's IPO misrepresented and omitted material information about MSN, including that: (1) MSN's strategy of rapid expansion through the opening and development of *de novo* branches was not successful, only created the appearance of success, and was thus adversely affecting the company's revenue growth; (2) MSN's *de novo* program consistently failed to meet budget targets and revenue forecasts; (3) MSN's budgets and financial

forecasts were wholly unreliable, arbitrary, and designed to mislead the market; (4) MSN faced severe pricing pressure from both clients and nurses; and (5) MSN faced adverse growth prospects. Plaintiffs lodge this claim against the issuer, MSN, as well as the individuals who signed the Prospectus; Defendants Adamson, Little, Ackerman, Wenstrup, and Hillinski.

Defendants raise a variety of arguments as to why the Section 11 count should be dismissed. First, Defendants argue that the Complaint fails to allege that MSN's IPO materials contained material misrepresentations or omissions. Second, Defendants maintain that the "bespeaks caution" doctrine makes any potential misrepresentations and omissions immaterial, since meaningful cautionary statements and specific warnings were included in the Prospectus. Third, Defendants contend that Plaintiffs' Section 11 count sounds in fraud, and thus should be plead with particularity under Federal Rule of Civil Procedure 9(b). For the following reasons, the Court disagrees.

### (i) Failure to Allege Material Misrepresentation or Omissions

The most significant of Plaintiffs' allegations in their Section 11 count is that MSN's IPO documents contained misleading material facts and/or omitted material facts relating to MSN's *de novo* program. In particular, Plaintiffs contend MSN's Prospectus and Registration Statement stated that the *de novo* program generated rapid revenue, was successful because of a strategy that enabled MSN to expand its presence quickly and efficiently enter new markets, that there was a risk that revenue growth would be adversely affected if MSN's ability to open *de novo* branches became impaired. (*Complaint* ¶¶ 95–96; 100). Plaintiffs posit that these statements were misleading and omitted

material facts because: (1) MSN failed to disclose that it lacked any plan as to where it would open *de novo* offices, and any specialized criteria for hiring (*Id.* ¶¶ 69–70); (2) the *de novo* offices were underperforming before the IPO, as reflected in the thrice-weekly reporting (*Id.* ¶¶ 79–80); (3) MSN suffered significant reversals in the *per diem* nurse market before its IPO (*Id.* ¶¶ 101–02); (4) MSN's thrice-weekly reporting demonstrated that the *de novo* offices consistently operated at approximately 50% below their expected budget projections (*Id.* ¶ 101(c)); and (5) MSN's *de novo* program was teetering on the brink of suspension, if not termination (*Id.* ¶ 101(e)). Plaintiffs contend that Defendants are liable for these misstatements and omissions, because the Registration Statement and Prospectus failed to disclose existing factors that seriously threatened MSN's business. *See generally In re Unicapital Corp. Sec. Litig.*, 149 F.Supp.2d 1353 (S.D.Fla.2001); *Sherleigh Assoc., LLC v. Windmere–Durable Holdings, Inc.*, 178 F.Supp.2d 1255 (S.D.Fla.2000).

■ Defendants assert that Plaintiffs have failed to adequately allege any misrepresentations or omissions concerning the *de novo* program. In essence, Defendants are asking the Court to determine whether the alleged misstatements or omissions are material. (*See, e.g.*, Motion [DE 42] at 5; Reply [DE 64] at 4). The test for materiality is well-settled. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir.2002). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the [misleading or] omitted fact would have been viewed by the reasonable inves-

tor as having significantly altered the 'total mix' of information made available.' " *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). It is the trier of fact that typically decides the issue of materiality. *Oxford*, 297 F.3d at 1189. The issue of materiality may only be decided as a matter of law when it is so plain that reasonable minds could not differ. *Id.* At this time, the Court cannot conclude that reasonable minds could not differ as to the materiality issue in this matter. The alleged misrepresentations and omissions contained in the IPO materials may very well have altered the "total mix" for the reasonable investor. Accordingly, the Court finds that as a matter of law Plaintiffs have adequately plead their Section 11 count.

### (ii) "Bespeaks Caution" Doctrine

■ When an offering document contains projections that are accompanied by meaningful cautionary statements and specific warnings of the risks involved, these statements and warnings may be sufficient to render any alleged misrepresentations or omissions immaterial as a matter of law under the "bespeaks caution" doctrine. *Saltzberg v. TM Sterling/Austin Assoc., Ltd., et al.*, 45 F.3d 399, 400 (11th Cir. 1995). Defendants allege that the "bespeaks caution" should render any misrepresentations and omissions about MSN's growth strategy and expectations immaterial, since such matters are forward-looking and adequate risk disclosures were present in the IPO materials.[3] Plaintiffs

---

**3.** Specifically, the Prospectus contained the following risk disclosures:

IF WE ARE UNABLE TO ATTRACT QUALIFIED NURSES AND ALLIED HEALTH-

CARE PROFESSIONALS FOR OUR HEALTHCARE STAFFING BUSINESS, OUR BUSINESS COULD BE NEGATIVELY IMPACTED.

counter that these risk disclosures do not fall under the protection of the "bespeaks caution" doctrine, because such warnings, even if adequate, cannot protect the misrepresentation or omission of present or historical facts.

Although this Circuit has not specifically ruled on this issue, "other Circuits have expressly limited the application of the 'bespeaks caution' doctrine to forward-looking, prospective representations, but they have noted that the misrepresentation of present or historical facts cannot be cured by cautionary language." *P. Stolz Family L.P. v. Daum,* 355 F.3d 92, 96–97 (2d Cir.2004) (citing *EP Medsys., Inc. v. EchoCath, Inc.,* 235 F.3d 865, 874 (3d Cir. 2000)). "The cautionary language associated with the 'bespeaks caution' doctrine is aimed at warning investors that bad things may come to pass-in dealing with the contingent or unforeseen future." *Id.* District courts in this Circuit have recognized this limitation. *Windmere,* 178 F.Supp.2d at 1274 n. 5 (reserving final ruling on the application of the bespeaks caution doctrine until after discovery in order to determine whether the misrepresentations or omissions were forward-looking at the time they were made).

Here, the Defendants are alleged to have made misrepresentations and omissions that were misleading at the time they were made, which would place these allegations, if true, beyond the protection of the "bespeaks caution" doctrine. For example, the IPO materials purport to warn that if MSN's "ability to continue to open *de novo* offices is impaired, our revenue growth may be adversely affected." (Complaint ¶ 100). However, Plaintiffs allege that at the time the IPO materials became effective MSN's ability to open *de novo* branches was already impaired. (*Id.* ¶ 80). If Plaintiffs allegations are proven true, then the risk disclosures contained within the IPO materials would inadequate, since the risk disclosures would purport to be forward-looking when in fact the risks were already present. As such, at this stage the Court cannot conclude that "bespeaks caution" doctrine should render any misrepresentations and omissions contained in the IPO materials about MSN's growth strategy and expectations to be immaterial as a matter of law.

WE OPERATE IN A HIGHLY COMPETITIVE MARKET AND OUR SUCCESS DEPENDS ON OUR ABILITY TO REMAIN COMPETITIVE IN OBTAINING AND RETAINING HOSPITAL AND HEALTHCARE FACILITY CLIENTS AND TEMPORARY HEALTHCARE PROFESSIONALS.
OUR BUSINESS DEPENDS UPON OUR CONTINUED ABILITY TO SECURE AND FILL NEW ORDERS FROM OUR HOSPITAL AND HEALTHCARE FACILITY CLIENTS, BECAUSE WE DO NOT HAVE LONG–TERM AGREEMENTS OR EXCLUSIVE CONTRACTS WITH THEM.
AN IMPORTANT PART OF OUR STRATEGY IS THE EXPANSION OF OUR BUSINESS THROUGH THE OPENING AND DEVELOPMENT OF DE NOVO BRANCHES. THE SUCCESS OF THIS EXPANSION
DEPENDS ON OUR ABILITY TO CONTINUE TO IDENTIFY AND RETAIN LOCAL MANAGEMENT AND TO SECURE GOOD LOCATIONS.
FLUCTUATIONS IN PATIENT OCCUPANCY AT OUR CLIENTS' HOSPITALS AND HEALTHCARE FACILITIES MAY ADVERSELY AFFECT THE DEMAND FOR OUR SERVICES AND THEREFORE THE PROFITABILITY OF OUR BUSINESS.
WE OPERATE IN A REGULATED INDUSTRY AND CHANGES IN REGULATIONS OR VIOLATIONS OF REGULATIONS MAY RESULT IN INCREASED COSTS OR SANCTIONS THAT COULD REDUCE OUR REVENUES AND PROFITABILITY.
WE MAY FACE DIFFICULTIES INTEGRATING OUR ACQUISITIONS INTO OUR OPERATIONS AND OUR ACQUISITIONS MAY BE UNSUCCESSFUL, INVOLVE SIGNIFICANT CASH EXPENDITURES OR EXPOSE U.S. TO UNFORESEEN LIABILITIES.
(Defendant's Motion [DE 42] at 3).

### (iii) Pleading Section 11 Count with Particularity

■ Defendants contend that the Complaint should be dismissed because Plaintiffs' Section 11 claims sound in fraud, and thus must satisfy Federal Rule of Civil Procedure 9(b) particularity requirements. *See Rhodes v. Omega Research, Inc.,* 38 F.Supp.2d 1353, 1359–65 (S.D.Fla.1999). Plaintiffs counter that their Section 11 count need not be plead with particularity because there is no allegation that Defendants acted with scienter in regards to this count. *See Holmes v. Baker,* 166 F.Supp.2d 1362, 1371–73 (S.D.Fla.2001). After reviewing the Section 11 count, the Court finds that Plaintiffs have carefully crafted their Complaint in such a manner as to avoid the need to plead their Section 11 count with particularity.

■ It is permissible for a plaintiff to allege a Section 11 of the Securities Act claim and a Section 10(b) of the Exchange Act claim in the same complaint, "even where both claims rely upon similar if not identical facts." *Holmes,* 166 F.Supp.2d at 1372. However, Section 11 and Section 10(b) "involve distinct causes of action an were intended to address different types of wrongdoing." *Herman & MacLean,* 459 U.S. at 381–82, 103 S.Ct. 683 (stating that Section 11 places a "relatively minimal burden" on a plaintiff while Section 10(b) is a " 'catchall' antifraud provision" requiring a plaintiff to carry a heavier burden). "No scienter is required for liability under § 11; defendants will be liable for innocent or negligent material misstatements or omissions." *In re Daou Sys. Inc.,* 411 F.3d 1006, 1027 (9th Cir.2005) (quoting *In re Stac Elecs. Sec. Litig.,* 89 F.3d 1399, 1403–04 (9th Cir.1996)); *see also Ehlert v. Singer,* 245 F.3d 1313, 1315–16 (11th Cir.

2001). A Section 11 count, as here, that does not rely upon the Exchange Act claims and steadfastly does not allege scienter under the Section 11 claim, "shall be interpreted as innocent or negligent misrepresentations and omissions, as opposed to fraudulent misrepresentations and omissions that would trigger Rule 9(b)." *Holmes,* 166 F.Supp.2d at 1372 (citing *Windmere,* 178 F.Supp.2d at 1272–73 (finding that a Section 11 claim did not sound in fraud when the Section 11 claim was silent on whether the defendants intentionally withheld information)).

Here, the Plaintiffs carefully craft their Section 11 count in a manner to avoid that claim from sounding in fraud, and thus avoid the need to plead this count with particularity. The Complaint expressly states that "there is no allegation with respect to [the Securities Act counts] that any of the Securities Act defendants acted with scienter." (*See, e.g.,* Complaint ¶ 55; *see also id.* ¶ 104). In addition, a careful review of the Section 11 count satisfies the Court that the Plaintiffs have not based this count upon the Defendants intent to mislead. (*See generally id.* ¶¶ 52–110). Rather the Court finds that Plaintiffs focused this count upon the allegedly untrue statements of material fact in the Prospectus or omissions of material fact from the Prospectus. (*Id.*). Accordingly, the Section 11 count does not sound in fraud, and does not have to be plead with particularity.

### 2. *Section 15 Claim*

Count II of the Complaint seeks to impose controlling person liability upon the Individual Defendants for the alleged Section 11 violations found under count I of the Complaint.[4] Section 15 of the Securities Act states,

---

4. In part, the Defendants argue that the Section 15 count must be dismissed, since the

Plaintiffs have failed to plead an adequate Section 11 count. *See Brown v. Enstar*

[e]very person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under [Section 11] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

■ To state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the general affairs of the entity primarily liable for the Section 11 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 11. *Unicapital,* 149 F.Supp.2d at 1367 (citing *Brown,* 84 F.3d at 396).[5] Here, the Section 15 controlling person count is premised upon the Individual Defendants' high-level positions with MSN at the time of the dissemination of the Registration Statement and Prospectus. Each of the Individual Defendants is alleged to have been either a director or principal of MSN during the time in question. (*Complaint* ¶¶ 16–20). According to the Complaint, "the Individu-

al Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the Registration Statement and Prospectus." (*Id.* ¶ 112).

■ While some, or all, of the Individual Defendants might ultimately demonstrate that they lacked the requisite power or control over MSN to be considers controlling persons pursuant to Section 15, such a factual inquiry would be inappropriate at this time. At this stage in the proceeding the Plaintiffs only need allege that the Individual Defendants had the power to control MSN, and that they had the power to influence the policy resulting in the Section 11 violation, i.e. the content of the misleading IPO materials. Having sufficiently plead these elements, the Court finds that the Plaintiffs have adequately plead their Section 15 controlling person count against all of the Individual Defendants.

### C. Exchange Act Counts

In addition to their Sections 11 and 15 Securities Act Counts, Plaintiffs have brought Counts III and IV pursuant to the Exchange Act. Count III alleges that Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b–5 by acting with scienter in making material misstatements or omissions of facts that mislead investors in who purchased MSN's securities during the class period. Count IV alleges that Defendants are liable pursuant

---

*Group, Inc.,* 84 F.3d 393, 396–97 (11th Cir. 1996) (holding that if there is no primary violation of Section 11, then there can be no vicarious liability under Section 15). However, as discussed above, the Court has found that Plaintiffs have sufficiently plead their Section 11 count, thus Defendants' argument on this ground is moot.

5. The controlling person analysis under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are identical. *See Pharo v. Smith,* 621 F.2d 656, 673 (5th Cir.), *amended by,* 625 F.2d 1226 (5th Cir.1980). The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

to Section 20(a) of the Securities Act as control persons for the Section 10(b) and Rule 10b–5 violations. In the instant Motion, Defendants contend that both Counts III and IV should be dismissed for failure to state a claim upon which relief may be granted. The Court agrees, in part.

### 1. *Section 10(b) and Rule 10b–5 Claim*

 To maintain state a fraud action pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b–5 a plaintiff must establish (1) a false statement or omission of material fact, (2) made with scienter, (3) upon which the plaintiff justifiably relied, and (4) that proximately caused the plaintiff's injury. *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997). In addition to meeting the above elements, a plaintiff "must plead with particularity, specific facts which give rise to a strong inference that the defendant acted in a severely reckless fashion." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir.1999). The PSLRA also requires that the "complaint shall state with particularity all facts on which" the allegations are formed. 15 U.S.C. § 78u–4(b)(1).

Even if a plaintiff can meet this pleading standard, the PSLRA allows defendants to argue on a motion to dismiss that the statements at issue were "forward-looking statements." 15 U.S.C. § 78u–5(c)(1); *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999). Liability for forward-looking statements may be avoided if such statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking-statement." 15 U.S.C. § 78u–5(c)(1)(A)(i); *Harris*, 182 F.3d at 803. Even if the forward-looking statement has no accompanying cautionary statement, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" that it was "false

or misleading." 15 U.S.C. § 78u–5(c)(1)(A)(i); *Harris*, 182 F.3d at 803.

In the instant Motion, Defendants make several arguments in support of dismissing Plaintiffs' Section 10(b) and Rule 10b–5 claim. In particular, Defendants contend that Count III should be dismissed because (1) the allegations are simple mismanagement claims not securities fraud claims; (2) the Plaintiffs have failed to meet the scienter standard of severe recklessness; (3) the facts plead do not meet the requisite particularity standards; and (4) any misleading statements are forward-looking statement protected by the safe harbor provisions of the PSLRA.

#### (i) **Simple Mismanagement**

 Securities law regulates disclosure of information, not the mismanagement of a company. *Santa Fe Industr., Inc. v. Green*, 430 U.S. 462, 479, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). As such, courts have generally held that a failure to disclose potential corporate mismanagement will not state a cause of action under federal securities fraud. *See, e.g., Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 (3d Cir.1989); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *see also Cutsforth v. Renschler*, 235 F.Supp.2d 1216, 1243 (M.D.Fla.2002). Defendants contend that the Complaint in this matter is replete with allegations amounting to nothing more than charges of corporate mismanagement. For example, Defendants argue that the following allegations amount to mere corporate mismanagement instead of securities fraud: (1) the setting of unattainable budgets (*Complaint* ¶ 123); (2) the pushing of managers to shoot for higher budget targets (*Id.* ¶¶ 150–68); (3) experiencing "an inability to manage its branch offices," (*Id.* ¶ 118); (4) not knowing much about MSN's branch office man-

agers (*Id.* ¶¶ 118, 199); (5) experiencing client relationship problems (*Id.* ¶¶ 187–95); (6) experiencing collection difficulties (*Id.* ¶¶ 179–86) and regulatory problems (*Id.* ¶¶ 187–95); (7) failing to do the necessary due diligence in connection with an acquisition (*Id.* ¶¶ 133, 134), and failing to maintain the level of business activity of an acquired company (*Id.* ¶¶ 135–48).

 Nevertheless, viewing the Complaint's allegations in a light most favorable to the Plaintiffs, the Court concludes that the Complaint alleges more than mere corporate mismanagement claims. The gravamen of Count III rests upon Defendants' alleged failure to disclose material information concerning MSN's financial situation by misrepresenting and falsifying the company's earnings releases and periodic reports in an attempt to mislead potential investors. For example, the Count III seeks redress for misleading statements made to the public by the Defendants concerning the performance of the *de novo* program, rather than recovery based upon mismanagement of the *de novo* program by MSN and its top officers. (*See, e.g., Complaint* ¶¶ 116–28; 213–218). As such, the allegations here "constitute adequate claims under federal securities law because their essence lies in a failure of full and fair disclosure, not in a failure to manage the company well." *Slavin v. Morgan Stanley & Co., Inc.*, 791 F.Supp. 327, 333 (D.Mass.1992).

### (ii) Scienter Requirement

 The PSLRA requires that a complaint contain particular facts raising a strong inference that a defendant acted with "the required state of mind." 15 U.S.C. § 78u–4(b)(2). In this Circuit this scienter requirement is satisfied by showing that the defendants had "an intent to deceive, manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." *Bryant,* 187 F.3d at 1282–83. In this case, the Plaintiffs proceeds under the "severely reckless state of mind" approach. Severe recklessness is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers and sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id.* at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989)). "Scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th Cir.2004).

 According to Plaintiffs, the reports of their twelve confidential witnesses and the corroborating internal documents of MSN demonstrate that Defendants acted with severe recklessness by inflating internal forecasts and communicating these manipulated numbers to the public.[6]

---

**6.** To demonstrate scienter Plaintiffs also appear to rely upon the temporal proximity of its 2003 earnings guidance to the disclosure of its true financial condition. In particular, Plaintiffs state "[a]s the Complaint here alleges, shortly after raising its 2003 earnings guidance (and subsequently reaffirming that increase), MSN announced that it would: (i) end the crucial *de novo* office program; (ii) close several offices; (iii) take a big charge to

earnings; and (iv) lower its forecasted earnings. (¶¶ 263–271)" (Plaintiffs Response [DE 63] at p. 22). However, to the extent that Plaintiffs are relying upon temporal proximity to prove scienter, the Court holds that "temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements

In particular, the Complaint alleges that Defendants manipulated MSN's 2003 budget forecast by requiring employees to "fix the numbers," and that these revised forecasts were made public. (*Complaint* ¶¶ 150–168). Additionally, the Complaint alleges that despite knowing that the Company was not performing well MSN used these manipulated numbers to portray itself as bucking the downward market trend that caused its competitors to struggle. (*Id.* ¶ 7). According to the Complaint, MSN continued to raise its earnings estimates, even after it planned to start closing *de novo* branches. (*Id.* ¶ 201).

■ Manipulating financial forecasts and failing to disclose the closure of *de novo* officers amounts to an extreme departure from the standards of ordinary care and presents a danger of misleading investors that is so obvious that the Defendants should have been aware of it. As such, the Court finds that the Plaintiffs have pled facts raising a strong inference of severe recklessness regarding the alleged violations relating to the 2003 budget process. However, scienter must be found with respect to each alleged violation of the statute. *Phillips*, 374 F.3d at 1018. Here, the Plaintiffs fail to demonstrate, and the Court fails to find, pleadings sufficient to give rise to a strong inference of severe recklessness regarding those alleged violations occurring prior to the 2003 budget process.[7]

Plaintiffs assert at a minimum twelve different violations of Section 10(b) and Rule 10b–5 that span the entire class period. Many of these violations are alleged to have occurred prior to the 2003 budget process, and thus cannot rest upon the inference of severe recklessness that exist in connection with that process. Plaintiffs allege that the 2003 budget process began in late October or early November in 2002. (*Complaint* ¶ 149). Viewing the allegations in the Complaint in the light most favorable to the Plaintiffs, the Court finds that at the very most the Plaintiffs have sufficiently plead that the violations occurring from October 29, 2002 onwards were pled with severe recklessness. However, the allegations in the Complaint concerning the violations of the statute taking place from April 18, 2002 to October 8, 2002, are inadequately plead, and must be dismissed for their failure to be include allegations giving rise to the requisite level of scienter.

### (iii) Pleading with Particularity

■ The PSLRA requires the complaint to "specify each statement alleged to have been misleading, the reasons or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To satisfy this

---

were fraudulent." *Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir.1993).

7. The Complaint does contain a blanket allegation that the Defendant Adamson used the "same routine" employed regarding the 2003 budget process in regards to other budgets. (Complaint ¶¶ 90–91 & 162). According to one confidential witness, Defendant Adamson's "M.O." was to manipulate the budget forecasts every year, which meant that there were always discrepancies between MSN's internal budget numbers and the reports given

to the public. (*Id.*). Without more detail as to Defendant Adamson's actions in these previous years the Court is unable to determine whether he acted with mere inexcusable neglect or severe recklessness. *See Theoharous v. Fong*, 256 F.3d 1219, 1224 (11th Cir.2001) (citing 15 U.S.C. § 78u–4(b)(2)). As such, the Court finds this catch-all allegation insufficient to give rise to the strong inference of severe recklessness regarding the violations lodged in the Complaint pre-dating the 2003 budget process.

requirement a complaint must "set forth in detail and with particularity the statements Plaintiffs allege to be false, when the statements were made, who made the statements, why the statements are false, and what the Defendants stood to gain in making the statements."[8] *In re Sunbeam Sec. Lit.*, 89 F.Supp.2d 1326, 1338 (S.D.Fla. 1999); *see also DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (stating that pleading with particularity "[m]eans the who, what, when, where, and how: the first paragraph of any newspaper story.").

■ Here, the Defendants assert that the Exchange Act counts should be dismissed for failing to be plead with the requisite particularity. In particular, the Defendants argue that the Plaintiffs have failed to assert with particularity why the statements are false or misleading.[9] However, as demonstrated below the Court finds that the Plaintiffs have plead sufficient facts to support why each of the alleged violations of Section 10(b) and Rule 10b–5 were misleading:

— On April 18, 2002, MSN's Prospectus was filed with the SEC and stated that the *de novo* branches generated rapid revenue, that the *de novo* program was successful because of a strategy that enabled MSN to expand its presence quickly and efficiently enter new markets, and that there was a risk that revenue growth would be adversely affected if MSN's ability to open *de novo* branches became impaired. (*Complaint* ¶¶ 95–96; 100). Plaintiffs contend that these statements were misleading and omitted material facts because: (1) MSN failed to disclose that it lacked any plan as to where it would open *de novo* offices (*Id.* ¶¶ 69–70); (2) the *de novo* offices were underperforming before the IPO, as reflected in the thrice-weekly reporting (*Id.* ¶¶ 79–80; 116–28); (3) MSN suffered significant reversals in the *per diem* nurse market before its IPO (*Id.* ¶¶ 101–02); (4) MSN's thrice-weekly reporting demonstrated that the *de novo* offices consistently operated at approximately 50% below their expected budget projections (*Id.* ¶¶ 101(c); 116–28); and (4) MSN's *de novo* program was teetering on the brink of suspension, if not termination (*Id.* ¶¶ 101(e); 116–28).

— On May 13, 2002, MSN released a press release that indicated that MSN had achieved "record results." Plaintiffs allege that when commenting on these results Defendant Adamson stated that MSN was very pleased with the strength of its first quarter 2002 results that reflect MSN's significant growth. (*Id.* ¶¶ 209–10). Plaintiffs assert that the May 13, 2002 press release and Defendant Adamson's statement where misleading in that these statements concealed that: (1) the *de novo* program was underperforming; (2) that MSN had no strategic plan for opening

---

**8.** The Eleventh Circuit has stated that Rule 9(b) is satisfied when a complaint sets forth, (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001).

**9.** Although based on the above conclusions, the Court is dismissing parts of the Complaint, since this dismissal is coupled with leave to amend, the Court will continue to address the Defendants arguments about the particularity of each alleged violation of Section 10(b) and Rule 10b–5.

new offices; and (3) the *per diem* market was going sour. (*Id.* ¶¶ 212).

— On May 30, 2002, MSN filed its quarterly report with the SEC on form 10–Q, which was signed by Defendants Adamson and Little, and reiterated the financial results released in the May 13, 2002 press release. (*Id.* ¶¶ 211). Plaintiffs assert that the May 30, 2002 SEC filings were misleading for the same reasons expressed in relation to the May 13, 2002 press results.

— On July 30, 2002, MSN announced in a press release its financial results for the period ending in June 30, 2002. (*Id.* ¶ 213). At the same time, MSN issued a guidance that touted its "on track" *de novo* openings as part of its success, and Defendant Adamson stated that MSN's growth substantially exceeds even the market growth rate. (*Id.* ¶¶ 213–18). Plaintiffs contend that this press release and statements were false since MSN was not growing in excess of the market growth and was facing severe margin compression and poor financial results. (*See, e.g., Id.* ¶ 116–28). Moreover, Plaintiffs maintain that MSN was manipulating its financial numbers to create an illusion of growth, which demonstrates that MSN knew that the *de novo* program was neither "on track" nor successful. (*Id.* ¶¶ 116–28; 149–78).

— On August 7, 2002, MSN issued a press release stating that it was "very comfortable" with the earnings guidance it had reported in its second quarter earnings release issued on July 30, 2002. In the August 7, 2002 press release Defendant Adamson projected MSN's net income for 2003 to be $0.90 and $0.92 per share. (*Id.* ¶ 219). Plaintiffs contend that the August 7, 2002 press release was misleading because it concealed that: (1) these projections were based on inflated revenue targets; (2) MSN knew demand was falling; (3) the profit margins were dropping; (4) and that MSN would fall short of reaching its projected numbers. (*See, e.g., Id.* ¶¶ 116–28; 149–78; 222).

— On August 14, 2002, MSN filed its quarterly report with the SEC on Form 10–Q, in which MSN reaffirmed its previously announced financial results. (*Id.* ¶¶ 219–21). Plaintiffs argue that this was a misrepresentation since: (1) MSN's earning projections were arbitrary and severely manipulated by Defendants Adamson and Little in order to provide positive numbers to Wall Street and investors, (*Id.* ¶¶ 149–78; 222); (2) MSN was aware that demand for nurse staffing had dramatically changed and that the company was facing gross margin compression, (*See, e.g., Id.* ¶ 116–28); and (3) that MSN failed to disclose its interest behind the STAT Medical acquisition, i.e. the poor performance of the *de novo* offices in that region, or the problems that manifested after the acquisition, (*Id.* ¶¶ 129–48).

— On October 8, 2002, MSN issued a press release in which Defendant Adamson stated, "[w]e remain confident that the Company's earnings will be in line with previously issued guidance." (*Id.* ¶ 223). Plaintiff contends that this statement was false and misleading because MSN could not have been "confident" with its earnings guidance when its earnings projections were arbitrary and severely manipulated by Defendants Adamson and Little in order to provide positive numbers to Wall Street and investors, (*Id.* ¶¶ 149–78; 222).

— On October 29, 2002, MSN issued a press release announcing "record" financial results for the third quarter of 2002. Commenting on MSN's purported "record" results, Defendant Adamson stated that MSN's growth rate continues to exceed the growth rate of the overall market as well as that of other publicly-traded competitors in the *per diem* nurse staffing

industry. (*Id.* ¶¶ 226–27). Plaintiffs argue that this statement failed to disclose that demand had sharply fallen; that, although MSN had opened new offices and looked successful, those offices were materially underperforming; and that MSN was not outpacing its publicly-traded competitors. (*Id.* ¶¶ 116–28; 149–78; 230).

— On October 30, 2002, MSN hosted an earnings conference call regarding its third quarter "record" results, and confirming its increased guidance for 2003. During this conference call Defendants Little and Adamson are alleged to have stated "[w]e believe that we can continue to expand our market leading positions through ... our unparalleled success in opening new offices on a scale that is unmatched in this industry." (*Id.* ¶¶ 231–234). Plaintiffs argue that the statements of Defendant Little and Adamson were misleading because MSN was not expanding its "market-leading" positions, and that MSN was facing gross margin compression and price dictation by its customers. (*Id.* ¶¶ 116–28; 149–207; 236).

— On November 11, 2002, MSN filed its third quarter report for 2002 with the SEC on Form 10–Q. This filing was signed by Defendants Adamson and Little, and reaffirmed MSN's previously announced financial results. (*Id.* ¶ 235). Plaintiffs assert that the November 11, 2002 SEC filings were misleading for the same reasons expressed in relation to the statements made at the October 30, 2002 earnings conference.

— On January 31, 2003, MSN filed a Form 8–K and issued a related press release wherein Defendant Adamson attempted to calm investor's concerns about the bankruptcy of one of its large clients by stating that "demand for temporary healthcare staff remains robust ...." (*Id.* ¶ 237). Plaintiffs contend that this statement failed to disclose that demand had fallen sharply, especially in the third quarter of 2002, and that MSN faced severe margin compression as well as underperforming *de novo* offices. (*See, e.g., Id.* ¶¶ 116–28; 149–207; 238).

— On February 18, 2003, MSN issued a press release announcing its fourth quarter and year-end results for the period ending on December 29, 2002. (*Id.* ¶ 239–43). Plaintiffs maintain that this press release failed to disclose that the *de novo* program was not financially successful, that MSN had no reasonable basis for the 2003 earnings guidance, that MSN had made the decision to close numerous offices and restructure its operations by suspending the *de novo* program. (*Id.* ¶¶ 150–178; 196–207; 251).

— On February 19, 2003, during an earnings conference call addressing the fourth quarter results for 2002, Defendant Adamson stated, "I guess we're trying to rationalize how [two large Travel Nurse companies] could go from a year ago or less than a year ago saying that they had five orders for every nurse that they had available to now finding themselves in a situation where demand is a problem ... that would suggest that demand has fallen off by some eighty-percent. And our results obviously would suggest that the market has not gone that soft." (*Id.* ¶¶ 246–48). Plaintiffs contend that Defendant Adamson's failed to disclose that demand had fallen off significantly. (*Id.* ¶¶ 150–178; 196–207; 251).

— On March 28, 2003, MSN filed its annual report with the SEC on Form 10–K, which stated that the *de novo* branches "generated rapid revenue growth and typically achieved positive EBITDA ... within six months of operation" and that MSN required its *per diem* applicants undergo a rigorous screening process. (*Id.* ¶¶ 252–254). Plaintiffs contend that this annual report was misleading because it played up

the purported success and sound management of the *de novo* program at a time when MSN was closing numerous branch offices, that demand for MSN had declined, and MSN did not interview each of its applicants. (*Id.* ¶¶ 150–78; 195–208; 255).

■ Additionally, Defendants contend that the Complaint should be dismissed for its failure to name the twelve confidential sources that Plaintiffs have used to support their allegations. This Court previously held that complaints under the PSLRA based upon anonymous sources should be dismissed. *See, e.g., In re Republic Services, Inc. Sec. Litig.*, 134 F.Supp.2d 1355, 1362 (S.D.Fla.2001); *In re Technical Chems. Sec. Litig.*, Case No. 98–7334, 2001 WL 543769, at *6 (S.D.Fla. Mar.20, 2001). However, in each of these previous decisions the Court relied upon the same precedent, which subsequently has been overturned. *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002) (adopting the Second Circuit's approach to whether confidential source material meets the particularity requirement); *Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 668–69 (8th Cir.2001) (overruling the decision of *In re Green Tree Financial Corp.*, 61 F.Supp.2d 860, 872 (D.Minn.1999), that required naming the source of the confidential information). Although it appears that the Eleventh Circuit has yet to directly address this particular issue, other Circuits have held that anonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged. *See, e.g., California Public Employees' Retirement*

*Sys. v. Chubb Corp.*, 394 F.3d 126, 148 (3d Cir.2004); *Adams v. Kinder–Morgan*, 340 F.3d 1083, 1102 (10th Cir.2003); *Cabletron* 311 F.3d at 29–30; *ABC Arbitrage Pls. Group. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir.2002); *Florida State Bd. of Admin.*, 270 F.3d at 668–69; *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.2000). This Court adopts this standard, and finds that the Plaintiffs have provided sufficient particularity regarding their twelve confidential sources to support the probability that these sources possessed the information they allege. (*See, e.g.,* Complaint ¶¶ 30–51).

### (iv) Forward–Looking Statements

■ The PSLRA provides a safe harbor for "forward looking statements," which absolves Defendants from liability if their statements are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C § 78u–5(c)(1)(A)(i). Even if the forward-looking statement has no cautionary language, the Plaintiffs must nonetheless prove that the Defendants made the statements with "actual knowledge" that they were "false or misleading." *Id.* § 78u–5(c)(1)(B); *Harris*, 182 F.3d at 803. However, the safe harbor of the PSLRA only applies to forward-looking statements and not material omissions or misstatements of historical or contemporaneous facts. *Miller v. Champion Enter., Inc.*, 346 F.3d 660, 677–78 (6th Cir.2003).

■ Here, the Defendants contend that Plaintiffs have failed to demonstrate that the Defendants possessed "actual knowledge" that the statements were "false or misleading."[10] Plaintiffs counter

---

**10.** In the instant Motion, Defendants fail to adequately address the details of the meaning-

ful cautionary language accompanying each of their statements. (*See* Motion [DE 42] at

that the Complaint contains sufficient support for a finding that Defendants had knowledge that MSN's statements were false or misleading. In particular, the Plaintiffs assert that Complaint alleges that: (1) Defendants Adamson and Little were confronted by employees with data that confirmed MSN's declining sales figures, struggling office, and failure to meet projected targets, (Complaint ¶ 62–65; 78–84; 116–24); (2) that Defendant Adamson and Little held face-to-face meetings with senior level management who informed the Defendants that the *de novo* offices were consistently underperforming, that MSN was experiencing severe margin compression, and that MSN was failing to make budgeted numbers, (*Id.* ¶¶ 170–73); and (3) that MSN's financial forecasting and internal budgeting were manipulated by the individual Defendants, (*Id.* ¶¶ 149–68). If Plaintiffs' allegations are true, as the Court must presume at this stage, Defendants' statements were made with "actual knowledge" that they were false and misleading. Thus, at this time, these statements fall outside the safe harbor of the PSLRA. *See McBride v. Vision Twenty–One, Inc.,* Case No. 99cv138T27F, 2000 WL 33996239, at *4 (M.D.Fla. Aug.21, 2000).

#### (v) "Bespeaks Caution" Doctrine

Finally, to the extent the statements are alleged to be misleading by Plaintiffs are not immune under the PSLRA's safe har-

bor, the Court concludes in the allegations in the Complaint regarding these statements are also not protected by the pre-PSLRA "bespeaks caution" doctrine.[11] As addressed above in relation to the Section 11 count, the "bespeaks caution" doctrine renders misrepresentations and omissions immaterial when they are accompanied by meaningful cautionary statements and specific warnings. *Saltzberg,* 45 F.3d at 400. However, the Court finds that the Defendants are alleged to have made misrepresentations and omissions that were misleading at the time they were made, which would place these allegations, if true, beyond the protection of the "bespeaks caution" doctrine. *See P. Stolz Family L.P.,* 355 F.3d at 96–97. Accordingly, at this stage, the Court finds that the "bespeaks caution" doctrine fails to render the alleged violations of Section 10(b) and Rule 10b–5 immaterial.

#### 2. Section 20(a) Count

Under Section 20(a) of the Exchange Act, to state a claim for controlling person liability against a defendant, it must be alleged that the defendant had (1) the power to control the general affairs of the entity primarily liable for the Section 10(b) or Rule 10b–5 violation at the time of the violation, and (2) the power to control or influence the specific policy that resulted in the primary violation under Section 10(b) or Rule 10b–5. *Unicapital,* 149 F.Supp.2d at 1367 (citing *Brown,* 84 F.3d

---

13–14). It appears that the Defendants have elected instead to argue that Plaintiffs' failure to allege actual knowledge requires dismissal of the Complaint even if the cautionary language accompanying the statements was not meaningful. (*Id.* at 13). However, to the extent that Plaintiffs desire to argue that meaningful cautionary language appeared with these statements, the Court notes that the Eleventh Circuit has ruled that district courts may not consider press releases in ruling on a motion to dismiss. *Bryant,* 187

F.3d at 1276. As such, the Defendants' example of meaningful cautionary language that accompanied MSN's October 29, 2002 press release cannot not be considered at this time. (*See* Motion [DE 42] at 23 n. 21).

11. While the Defendants do not expressly argue for the application of the "bespeak caution" doctrine to the Section 10(b) and Rule 10b–5 counts, in an abundance of caution the Court will nevertheless address the issue.

at 396).[12] Here, the Defendants argue that Plaintiffs have failed to plead a primary violation under Section 10(b) or Rule 10b–5 of the Exchange Act, and therefore the Section 20(a) controlling persons claim must also be dismissed. *Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir.2001).

As discussed above, the Court has found that certain allegations in the Complaint lack the requisite scienter and therefore must be dismissed. Accordingly, to the extent that the Section 20(a) Count rests upon violations of Section 10(b) or Rule 10b–5 that have been dismissed, i.e. the alleged violations occurring before October 29, 2002, the Court must also dismiss the Section 20(a) Count. However, to the extent that the Section 20(a) Count rests upon the alleged violations of Section 10(b) or Rule 10b–5 that have not been dismissed, the Complaint sufficiently pleads a Section 20(a) claim.

### III. CONCLUSION

The Court concludes that the Complaint in this case should be dismissed, based upon the foregoing reasons, in particular the failure to plead with particularity specific facts that the Defendants acted in a severely reckless fashion in making the statements in the Exchange Act Counts before October 29, 2002. The Court, however, will give Plaintiffs leave to amend.

Accordingly, it is **ORDERED AND AD-JUDGED** as follows:

1. Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [DE 42] is hereby **GRANTED**, in part.

---

12. The controlling person analysis under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are identical. *See Pharo*, 621 F.2d at 673 (5th Cir.), *amended by*, 625 F.2d 1226 (5th Cir.1980). The Eleventh Cir-

2. The Court hereby **DISMISSES** those portions of Count III and Count IV that relate to the statements made before October 29, 2002.

3. Plaintiffs are hereby granted leave to file an Amended Complaint by October 11, 2005. Failure to timely file an Amended Complaint will result in a dismissal with prejudice of the portion of the Complaint relating to the dismissed allegations.

cuit, in *Bonner*, 661 F.2d at 1209, adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.